Prerna Preshika Lal
Lal Legal APLC
2001 Addison st, STE 300
Berkeley CA 94704
Phone: (800) 552-5616
prerna@lallegal.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAMMAD ANOOSH AZIZI, SORAYA AZIZI, MUZHGAN ALI, MOHAMMAD WALID AZIZI, NARGIS GHAFOORI, SHAHRAM MOHAMMAD AZIZI, ASAYESH AZIZI, SHADAB SHAHAB, AZIZALRAHMAN RAHMANI, BEHESHTA RAHMANI, HUSNA RAHMANI | Case No.: 2:24-at-1361 |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |
| ALEJANDRO N. MAYORKAS, Secretary of the U.S. Department of Homeland Security; UR M. JADDOU, Director of the United States Citizenship and Immigration Services | |
| Defendants. | |

**INTRODUCTION**

1. Plaintiffs, Afghan citizens and nationals, are clinging to survival as the Taliban's iron fist crushes their homeland. Their U.S.-based loved ones are fighting a desperate battle to bring them to safety. United in their anguish, they demand that the U.S. government act swiftly on adjudicating their long-overdue humanitarian parole applications.

2. Plaintiff Mohammad Anoosh Azizi ("Mr. Azizi") worked with the U.S. military in Afghanistan and is now a U.S. citizen living in California. He was left heartbroken when the Taliban seized control of his homeland in August 2021. While some of his family members were evacuated to the United States and received asylum, others were trapped in a country now ruled by a brutal regime. Desperate to save them, Mr. Azizi turned to USCIS's "humanitarian parole" program, a lifeline for those facing imminent danger. He applied for four relatives, hoping to bring them to safety in the United States.

3. USCIS's humanitarian parole process was a cruel deception. After enticing thousands of Afghans to apply and extort millions in fees, the agency abruptly changed the rules, effectively shutting the door on most applicants. USCIS abandoned procedural safeguards and neglected to adjudicate cases, leaving individuals like Mr. Azizi's family in limbo. Tragically, while waiting to reunite with his father, Mr. Azizi's newborn nephew perished trying to escape the Taliban. Even after desperate pleas for expedited action, USCIS remained indifferent, condemning survivors to a perilous future in Afghanistan.

4. USCIS's glacial pace in processing immigration applications has left countless individuals, like Mr. Azizi and his family, in dire straits. These vulnerable people, including those targeted

by the Taliban for their service to the U.S. in Afghanistan, are trapped in a perilous limbo. Some are forced to hide in Afghanistan, while others cling to temporary visas in neighboring countries, haunted by the threat of deportation back to Afghanistan. Yet, despite the devastating consequences, USCIS continues to drag its feet, leaving these lives hanging in the balance.

5. USCIS has repeatedly flouted its own rules, arbitrarily changing standards and procedures without a shred of transparency or accountability. The agency's glacial pace in processing applications, some filed over three years ago, is inexcusable. Plaintiffs demand that this Court declare USCIS's actions unlawful, void them, and compel the agency to promptly adjudicate all pending applications in accordance with established procedures and standards that USCIS had in place on August 31, 2021.

## PARTIES

6. Plaintiff Mohammad Anoosh Azizi is a U.S. citizen living in Ceres, California. He petitioned to USCIS for humanitarian parole for his family members: Mohammad Walid Azizi, Nargis Ghafoori, Shahram Mohammad Azizi and Asayesh Azizi.

7. Plaintiffs Mohammad Walid Azizi, Nargis Ghafoori, Shahram Mohammad Azizi and Asayesh Azizi are Afghan nationals and beneficiaries of pending applications for humanitarian parole to USCIS.

8. Plaintiff Soraya Azizi is a U.S. citizen living in Ceres, California. She petitioned to USCIS for humanitarian parole for her family members: Azizalrahman Rahmani, Beheshta Rahmani, Husna Rahmani.

9. Plaintiffs Azizalrahman Rahmani, Beheshta Rahmani, Husna Rahmani are Afghan nationals and beneficiaries of pending applications for humanitarian parole to USCIS.

10. Plaintiff Muzghan Ali is a U.S. citizen living in Hercules, California. She petitioned to USCIS to sponsor Shadab Shahab, a relative.

11. Plaintiff Shadab Shahab, an Afghan national, was formerly a Grants Mobilization Officer in Roots of Peace (CBARD-AIM) project in Afghanistan. He is the fiancé of Mr. Azizi's sister, Shayesta Azizi, who is currently living in Ceres, California.

12. Defendant Alejandro N. Mayorkas, named in his official capacity, is the Secretary of the U.S. Department of Homeland Security.

13. Defendant Ur M. Jaddou, named in her official capacity, is the Director of the U.S. Citizenship and Immigration Services. USCIS is a component agency of DHS that adjudicates applications for immigration benefits, including humanitarian parole.

14. The Defendants are herein sued in their official capacities.

### **JURISDICTION**

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal subject matter jurisdiction) in conjunction with 28 U.S.C. §§2201-2202 (declaratory judgment act), 28 U.S.C. § 1361 (mandamus), the Administrative Procedure Act (APA) (5 U.S.C. §555(b)), and the Immigration & Nationality Act and regulations implementing it (Title 8 of the C.F.R.).

16. Under 28 U.S.C. § 1331, "(t)he district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." There is jurisdiction under 28 U.S.C. § 1331 because this action arises under 28 U.S.C. §2201 (declaratory

judgment), 28 U.S.C., § 1361 (mandamus), the Administrative Procedures Act (APA) (5 U.S.C. § 701 et seq.), and the Immigration & Nationality Act ("INA") and regulations implementing it (Title 8 of the C.F.R.).

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1361 (Mandamus Act) ("The District Courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff").

18. Agency discretion does not authorize the unreasonable delay or wholesale suspension of adjudication. The APA permits this Honorable Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The APA requires that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).

19. The action does not challenge the granting or denial of an individual application or petition. Therefore, the jurisdictional limitations of INA § 242, 8 U.S.C. § 1252, do not apply. *Uranga v. United States Citizenship & Immigration Servs.*, 2020 U.S. Dist. LEXIS 177661, *17 (D.D.C. Sept. 28, 2020) ("Court finds that sections 1252(g) and 1252(a)(5) do not divest it of jurisdiction"); *Liu v. Novak*, 509 F. Supp. 2d 1, 6 (D.D.C. 2007) (holding that Section 1252(a)(2)(B)(ii) only bars review of actual discretionary decisions, not the failure to render a decision); *see also Iddir, v. I.N.S.*, 301 F.3d 492, 497 (7th Cir. 2002) (explaining that "judgment" means only actual discretionary decisions to grant or deny adjustment of status).

**VENUE**

4

20. Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(e) because Plaintiffs Mohammad Anoosh Azizi and Soraya Azizi reside in Ceres, California, which falls within the jurisidiction of the Eastern District of California. 8 U.S.C. § 1421(c); 28 U.S.C. § 1391(e)(1)(C). Venue is also proper because all non-U.S. citizens in this action reside in Ceres, California if humanitarian parole is granted. Venue is proper under 28 U.S.C. § 1391(e) because Alejandro N. Mayorkas and Ur M. Jaddou, are officers of the United States acting in their official capacities and may be sued in any judicial district where plaintiff resides.

## **BACKGROUND**

**I.  The United States' withdrawal from Afghanistan left thousands of U.S.-allied Afghans in danger.**

21. On August 30, 2021, the United States ended a 20-year intervention in Afghanistan.

22. The U.S. withdrawal from Afghanistan in August 2021 led to the Taliban's rapid takeover. This swift power shift put numerous Afghans at risk, including former government officials, military personnel, journalists, academics, minorities, women, and others who had collaborated with the U.S.

23. Many endangered Afghans attempted to flee the country. Tragically, hundreds perished in chaotic scenes at Kabul airport, including those who fell from a departing U.S. plane and those crushed in the crowds. A deadly suicide bombing on August 26, 2021 further exacerbated the crisis, claiming the lives of 13 U.S. service members and numerous Afghans.

24. The United States airlifted more than 100,000 Afghan nationals out of the country in the final weeks of August 2021. Through a memorandum issued on August 23, 2021, Secretary Mayorkas authorized U.S. Customs and Border Protection ("CBP"), a component agency of

DHS, to parole many of these Afghans into the United States under 8 U.S.C. § 1182(d)(5) on a case-by-case basis. CBP ultimately paroled approximately 70,000 Afghans from U.S. military bases and other sites around the world into the United States

25. But the evacuation efforts left thousands of U.S.-allied and other at-risk Afghans behind. Many made it to the airport, but could not board flights. And with the collapse of the Afghan government, thousands of Afghans took necessary shelter from the Taliban, or otherwise determined that going to the airport was too dangerous. Indeed, just days after the Taliban seized power, on August 21, the U.S. government advised U.S. citizens to avoid Kabul airport.

26. The distinction between those Afghans who made it out through the airlift and those who did not was the product of various factors—including happenstance—none of which suggests that those left behind were less "deserving" of evacuation or less likely to be eligible for relief from the United States.

27. In the weeks that followed, tens of thousands of vulnerable Afghans who had been left behind sought help from USCIS through applications for a form of relief called humanitarian parole.

**II. USCIS held out the prospect of humanitarian parole for those who could not be airlifted**

28. As the military evacuation effort came to a close, USCIS appeared poised to help U.S. allies in Afghanistan. By August 2021, officials at USCIS had identified and analyzed multiple avenues for Afghans to enter the United States, both temporarily and permanently. These avenues included the Special Immigrant Visa ("SIV") program for interpreters and others who had worked for the U.S. government in Afghanistan for at least a year, a refugee priority program for individuals who worked with U.S. media or nonprofit organizations, and family

petitions from immediate family members who were U.S. citizens or lawful permanent residents.

29. USCIS also identified humanitarian parole as an avenue for Afghans seeking entry to the United States. Unlike the SIV program and certain other forms of relief, humanitarian parole does not have rigid eligibility constraints. Rather, under the Immigration and Nationality Act, the Secretary of Homeland Security is authorized "to parole any [noncitizen] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

30. A grant of humanitarian parole allows noncitizens to enter the United States temporarily, often for one year, during which they may apply for asylum or other immigration benefits, if eligible.

31. Anyone may apply for humanitarian parole on behalf of a noncitizen overseas (or the noncitizen may self-petition) by filing with USCIS a Form I-131 Application for Travel Document and a Form I-134 Affidavit of Support from a sponsor that is willing to provide financial support if needed. Initially, USCIS charged the Plaintiffs an application fee of $575 for every application for humanitarian parole.

32. At USCIS, humanitarian parole applications are supposedly adjudicated by the agency's Humanitarian Affairs Branch. Before August 2021, the office had a small number of adjudicators, who processed fewer than 2,000 applications per year on behalf of noncitizens from all over the world. The office typically processed those applications within 90 days of receipt. It approved approximately 500 to 700 applications each year—an approval rate of 25-35%.

33. Denials of humanitarian parole are not subject to appeal. When USCIS approves an application for humanitarian parole, a noncitizen generally must then travel to a U.S. consulate to be screened and interviewed. If a noncitizen is approved for travel by the consulate, the U.S. Department of State typically issues a travel document facilitating air travel to the United States.

34. At a listening session hosted by DHS on August 25, 2021, USCIS solicited feedback from over 200 legal service providers and others on effective and efficient ways to process Afghan applications. The agency identified humanitarian parole as among the legal pathways for those fleeing the evolving crisis in Afghanistan.

35. On August 26, 2021, USCIS published a webpage specifically providing "Information for Afghan Nationals on Parole Into the United States."

36. This Afghan-specific humanitarian parole page explained that "Individuals who are outside of the United States may request parole into the United States based on urgent humanitarian or significant public benefit reasons for a temporary period, on a case-by-case basis." It provided that "[a]nyone may request parole for themselves, or on behalf of another individual," by filling out the form.

37. The website instructed applicants to "[w]rite 'Afghanistan Humanitarian Parole' on the mailing envelope," and "[f]or expedited processing, write the word EXPEDITE in the top right corner of the application in black ink." It told beneficiaries without passports to provide "available identity documentation and an explanation of why they do not have an Afghan passport."

38. The website further explained that "beneficiaries . . . may need to arrange travel to a U.S. embassy outside of Afghanistan to continue processing their parole request."

39. On August 26, 2021, USCIS also modified its general humanitarian parole webpage by adding a banner that directed Afghan nationals to the agency's new Afghan-specific humanitarian parole webpage.

40. Until early September 2021, USCIS acted with reasonable dispatch to address Afghan humanitarian parole applications in light of the dangerous situation beneficiaries faced. On information and belief, USCIS approved—or at least conditionally approved, subject to screening at a consulate—most if not all Afghan humanitarian parole applications adjudicated during that period. The agency instructed those grantees who were still in Afghanistan that completing the humanitarian parole process would require travel to a U.S. consulate.

**III. As applications increased, USCIS changed course and adopted standards and procedures that facilitated the denial of applications.**

41. On information and belief, these early approval trends reflected USCIS's recognition that many Afghan beneficiaries left behind by the U.S. evacuation presented "urgent humanitarian reasons" warranting a grant of humanitarian parole under then-existing standards.

42. As USCIS could reasonably have expected when it held out the prospect of humanitarian parole for Afghans—particularly in light of the dire situation on the ground—the agency received thousands of applications for humanitarian parole for Afghans beginning in late August 2021.

43. These applications reflected a significant mobilization on behalf of the Afghan community in the United States, attorneys, nonprofit organizations, and the public at large to fill out necessary forms, gather supporting documents, and raise money for filing fees.

44. On information and belief, in a few short months, the agency collected more than $20 million in filing fees in connection with humanitarian parole applications for Afghans.

45. Confronted with applications from so many desperate Afghans, USCIS paused adjudications for approximately two months, from early September to sometime in November.

46. Although USCIS assigned and trained additional adjudicators to handle Afghan applications, on information and belief, the adjudicators assigned to Afghan applications were not permitted to adjudicate them under the standards in effect on August 31, 2021.

47. Instead, knowing that tens of thousands of Afghans would qualify for humanitarian parole under then-existing standards, USCIS abandoned those standards and adopted new ones.

48. The new standards operated on at least two fronts to ensure that the vast majority of Afghan humanitarian parole applications would be denied. First, on information and belief, USCIS decided that, as a rule, it would not issue approvals or conditional approvals for noncitizens who were still in Afghanistan. Instead, USCIS decided that the only decisions it would issue for beneficiaries who were still in Afghanistan were (1) denials, or (2) letters administratively closing an application until such time as USCIS was notified that the beneficiary had left Afghanistan. On information and belief, this rule relied on the absence of a U.S. consulate in Afghanistan—a reality that already existed and USCIS acknowledged when it was still granting approvals or conditional approvals to vulnerable noncitizens in Afghanistan, and

when it took pains to inform vulnerable Afghans and their advocates that they could apply for humanitarian parole.

49. Second, on information and belief, at the same time that it determined it would not grant humanitarian parole to Afghans in Afghanistan, USCIS also instructed its adjudicators that applications filed on behalf of individuals who had already left Afghanistan could be approved only in extreme cases in which beneficiaries faced either imminent harm in the country in which they were present or an imminent risk of being returned to Afghanistan.

50. On information and belief, USCIS determined that these new heightened standards would apply retroactively to thousands of already-pending humanitarian parole applications, including those filed by the Plaintiffs.

51. USCIS even withdrew approvals or conditional approvals that it had previously granted, contending that they required re-review under the new criteria.

52. USCIS did not notify applicants and beneficiaries, including the Plaintiffs, that it had changed its standards such that those who had already fled Afghanistan would have a reduced chance of receiving humanitarian parole, while those who remained would have no chance of receiving humanitarian parole at all.

**IV. USCIS is not adjudicating humanitarian parole applications on behalf of Afghans within a reasonable time.**

53. In addition to USCIS's decisions to all but stop granting Afghan humanitarian parole applications and abandon its usual standards, the agency has also appeared reluctant to process the applications at all—leaving adjudications at a trickle.

54. On information and belief, from early September to sometime in November 2021, USCIS stopped adjudicating Afghan humanitarian parole applications, but it continued to adjudicate applications filed on behalf of nationals of other countries.

55. Even if the small humanitarian affairs office initially faced challenges adjudicating the substantial number of applications from Afghan nationals, the number of adjudicators had increased approximately five-fold by around November 2021.

56. On information and belief, USCIS has approved a little over 1860 Afghan humanitarian parole applications out of the approximately 52,870 that it has received since July 2021. This is an abysmal approval rate of less than 3 percent.

57. Even accounting for a period in which USCIS was ramping up its staffing and assuming that around 2000 applications have been adjudicated in a five-month period from December through April, USCIS would require more than seven years to process over 40,000 pending Afghan humanitarian parole applications at its current pace—a pace that is all the more unreasonable considering the dire humanitarian situation of those seeking this benefit.

**V.  USCIS's change in policy has left Afghans stranded, at risk, and hopeless.**

58. The change in USCIS's policy with regard to humanitarian parole applications on behalf of Afghans has devastated those who put their faith in the humanitarian parole process.

59. Beginning in August 2021, Afghans in the United States—with the support of the legal community and others—undertook substantial and often frenzied efforts to prepare humanitarian parole applications and raise thousands of dollars in application fees in a desperate bid to save their family members.

12

60. Loved ones in Afghanistan and third countries also made significant sacrifices to assist in their applications. In many cases, these efforts placed applicants in greater danger than if they had not applied, due to the possibility of the Taliban discovering their communications and documents.

61. Afghan applicants and beneficiaries seeking humanitarian parole from USCIS—including the Plaintiffs here—relied on the existence of a process that would be open and fair. Applicants often made life decisions about where to go and what to do based on the hope of action on their applications. For many families, there was and is no backup plan, no other contemplated or available pathway to safety or stability.

62. But while the Afghans who arrived via the airlift were quickly granted parole by CBP, those left behind have had to wait and watch as written and binding policies were ignored, standards were changed, and tens of millions of dollars in application fees entered government coffers while their families were left stranded, in imminent danger, and without hope.

63. Afghan applicants have seen USCIS demonstrate its ability to expeditiously respond to a crisis through humanitarian parole. Under USCIS's humanitarian parole process for Ukrainians, a U.S.-based sponsor can file an application online, and when it is approved, the Ukrainian beneficiary can register with USCIS electronically and attest that they meet all requirements to enter the United States.[1] The filing fee was waived. And without requiring travel to a consulate, USCIS issued electronic travel authorizations that allowed travel to the United States for further processing by CBP upon arrival. USCIS processed over 6,000 such

---

[1] *See* USCIS, Uniting for Ukraine, uscis.gov/humanitarian/uniting-for-ukraine (last accessed on Oct. 25, 2024).

applications within the first three weeks—far exceeding the total number of Afghan humanitarian parole adjudications in the three years since August 2021.[2]

64. On April 9, 2024, Plaintiffs, through counsel, submitted a FOIA Request to USCIS. The Request sought aggregate data and statistics related to humanitarian parole applications for Afghanistan citizens and nationals. *See* Exh. A. Despite its statutory obligation to respond within 20 days, Defendant USCIS has failed to produce any records responsive to the FOIA Request. Accordingly, Plaintiffs are entitled to a judgment declaring that Defendant has violated FOIA and ordering Defendant to: conduct a reasonable and adequate search for records responsive to the FOIA Request and to provide such records to counsel.

65. Pursuant to a nationwide permanent injunction, Defendant USCIS must cease violating FOIA's statutory deadlines in 5 U.S.C. § 552(a)(6)(A) and (B), which require determinations within 20 business days or, in the case of "unusual circumstances," within 30 business days, respectively. *See Nightingale v. USCIS*, 507 F. Supp. 3d 1193 (N.D. Cal. 2020).

66. Meanwhile, Afghans confront an economy in shambles, continual terror attacks by the group known as "ISIS-K," and a Taliban regime brutally cracking down on its opponents. Women also face increasing restrictions: they cannot study beyond primary school, work in most jobs, or go outside without a male relative and clothing that covers them from head to toe. What is more, the Taliban are reportedly working to improve their technology and surveillance infrastructure with possible foreign assistance—posing grave threats to Afghans who have Western ties or are seeking help to get to the United States, including the Plaintiffs here.

---

[2] *See* Rebecca Beitsch, Nearly 6,000 Ukrainians have received temporary residency in US through new program (THE HILL May 9, 2022), thehill.com/news/3482233-about-6000-ukrainians-have-received-temporary-residency-in-us/.

**STATEMENT OF FACTS**

67. The Plaintiffs are U.S.-based applicants and Afghan beneficiaries of humanitarian parole applications. In 2021, each placed their hopes for safety in USCIS's humanitarian parole process. Each requested expedited treatment of their application. And given the dangers they and their families faced, they reasonably believed that USCIS would take prompt action to provide them with protection. They did not know and could not have imagined that USCIS would cease treating their applications as urgent and decline to take action for years.

68. Plaintiff Mohammad Anoosh Azizi served as a local linguist for the U.S. allied forces in Afghanistan before immigrating to the United States in 2014 on a Special Immigrant Visa ("SIV") due to the threats he received from the Taliban. He became a U.S. citizen but the threats to his family in Afghanistan did not stop. On or about September 19, 2021, Mr. Azizi requested humanitarian parole for his brother, Mohammad Walid Azizi (MSC229981181, later converted to IOE8556623629) and sister-in law, Nargis Ghafoori (MSC229981182 later converted to IOE8063628546), because their lives were threatened in Afghanistan as a result of Mr. Azizi's work for the U.S. military. Exh. B. These parole applications remain pending over three years later despite Mr. Azizi's request to expedite them.

69. Plaintiff Mohammad Walid Azizi used to work as a procurement officer in Afghanistan until the Taliban takeover of Afghanistan on August 15, 2021. On the same day, Mohammad Walid Azizi assisted his parents and siblings by driving them to the airport to be airlifted by the United States. The Taliban recognized the Azizi family and threw a grenade in their direction, which injured a family member badly enough to stop them from escaping that day. While he helped his parents and siblings escape Afghanistan in the next few days, Mohammad Walid

15

Azizi could not leave as his wife, Nargis Ghafoori, who was around 9 months pregnant at the time. In October 2021, Nargis Ghafoori gave birth to their first-born, Shahram Mohammad Azizi, in Afghanistan. In December 2022, the couple had another child, Asayesh Azizi.

70. Plaintiff Mohammad Anoosh Azizi also filed an I-131 for both children in December 2023, which is currently pending with USCIS: IOE9820655176 for Shahram Mohammad Azizi and IOE9408663855 for Asayesh Azizi. Exh. C.

71. Plaintiff Mohammad Walid Azizi, his wife, and children continue to live under the threat of the Taliban in Afghanistan. The family changes their location every 2-3 months to remain undetected. Their only hope of getting out of Afghanistan alive at this point is the U.S. humanitarian parole program.

72. The situation of Plaintiff Azizalrahman Rahmani and his family is also heartbreaking. As a former Afghan police officer, he and his family are at significant risk from the Taliban due to his previous service with the police. The tragic killing of his brother and police officer, Ahmad Popal Rahman, in July 2021, underscores the danger they face from the Taliban in Afghanistan.

73. Plaintiff Azizalrahman Rahmani and his wife, Behesta Rahmani, tried to escape Afghanistan on the day of the Taliban takeover, but his wife went into labor while they were on the way to the airport, so the couple could not leave. Instead they headed to the hospital, where Behesta Rahmani gave birth to Husna Rahmani.

74. Plaintiff Soraya Azizi filed humanitarian parole applications for Azizalrahman Rahmani (MSC2299804583), Behesta Rahmani (MSC2299804584) and Husna Rahmani

((MSC2299804584), in September 2021, which still await adjudication three years later. Exh. D.

75. The situation of Azizalrahman Rahmani and his family is dire. They are living in constant fear under the Taliban regime in Afghanistan, forced to relocate frequently to avoid detection. Like many other Afghans seeking refuge, the Rahmani family's hopes rest on the U.S. humanitarian parole program.

76. Plaintiff Shadab Shahab worked for a U.S. non-profit, Roots of Peace, as a Grants Mobilization Officer in Afghanistan. He is the fiancé of an asylee in the United States, but unable to marry and join her. He has received multiple threatening phone calls from the Taliban, and remains in hiding in Afghanistan.

77. Plaintiff Muzhgan Ali filed a humanitarian parole application for Plaintiff Shadab Shahab (IOE8740958328) in October 2021, which has never been adjudicated. Exh. E.

### CAUSES OF ACTION
### COUNT I
### Violation of the APA, 5 U.S.C. § 706
### Arbitrary and Capricious Agency Action

78. The above paragraphs are incorporated by reference.

79. The APA directs reviewing courts to invalidate agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

80. Agency action is arbitrary and capricious, among other things, when agencies "depart from a prior policy *sub silentio*," "disregard rules that are still on the books," or fail to "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

515 (2009). An agency may not "rel[y] on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, [or] offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Among the aspects of a problem that an agency must consider, "it would be arbitrary and capricious to ignore" the "reliance interests" generated by prior policies. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

81. The Plaintiffs who have pending applications have a clear right receive a determination on their applications for humanitarian parole. USCIS has failed to discharge its mandatory duty to issue an adjudication, and those Plaintiffs lack an adequate remedy other than this litigation. Mandamus relief is therefore appropriate.

82. The APA directs reviewing courts to invalidate agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

83. Around November 2021, after receiving thousands of applications from Plaintiffs and others, USCIS implemented new standards used to adjudicate requests for humanitarian parole on behalf of Afghans. Those changes had the purpose, and effect, of making it all but impossible for Afghan beneficiaries to be granted this benefit.

84. In addition, USCIS altered these standards without publicly announcing the change or providing a reasoned basis for it. It applied those changes to already-pending applications without notifying applicants.

85. On information and belief, USCIS's change in standards was based at least in part on impermissible considerations. These included the agency's apparent realization that many Afghans would qualify for humanitarian parole under the standards then in effect, the desire for a standard that would lead to more denials, and the desire to deter more applicants. And the agency evidently failed to consider important aspects of the problem, including the reliance interests of the Plaintiffs and other applicants and beneficiaries, who paid more than 20 million dollars in application fees and who were waiting for a decision while in hiding from the Taliban or in third countries in which they have no long-term prospects.

86. USCIS's change to its adjudication standards for Afghan humanitarian parole applications— and its abandonment of its otherwise applicable rules and policies—were arbitrary and capricious, and otherwise in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT II
### Violation of the APA, 5 U.S.C. § 706
### Failure to Comply with Law and Agency Rules

87. The above paragraphs are incorporated by reference.

88. Agency action that is "not in accordance with law" violates the APA. 5 U.S.C. § 706(2)(A). And "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions." *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 60-61 & n.3 (D.D.C. 1998); *see Damus v. Nielsen*, 313 F. Supp. 3d 317, 336–37 (D.D.C. 2018) (agency must abide by its rules regarding parole, "and particularly those that affect individual rights"); *see also United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

89. The humanitarian parole statute provides that the agency will make parole decisions "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). And the agency's Policy Manual sets forth its procedures and provides that it "is to be followed by all USCIS officers in the performance of their duties but it does not remove their discretion in making adjudicatory decisions."

90. In contravention of the requirements set forth in the statute and Policy Manual, the agency has substituted case-by-case adjudication for a categorical rule refusing to approve Afghan humanitarian parole applications for Afghan nationals located in Afghanistan, and failed to adhere to its own policies, including for issuing RFEs and/or NOIDs whenever there is a possibility that the applicant may be eligible for humanitarian parole. *See* 8 U.S.C. § 1182(d)(5)(A).

### COUNT III
### Violation of the APA, 5 U.S.C. § 553
### Failure to Comply with Notice-and-Comment Requirements

91. The above paragraphs are incorporated by reference.

92. To issue a rule, the APA requires an agency to adhere to specific procedural requirements. The agency must first publish a notice in the Federal Register, allow for comment, and incorporate comments into a final rule. 5 U.S.C. § 553; *see id*. §§ 551 (defining "rule" and "rule making"), 706(2)(D) (concerning agency action "without observance of procedure required by law").

93. These requirements apply to all legislative, or substantive, rules. *See AFL-CIO v. NLRB*, 466 F. Supp. 3d 68, 87 (D.D.C. 2020). "[A]n agency rule is essentially presumed to be substantive for the purpose of the notice-and-comment requirement, and [] notice-and-comment rulemaking is thus generally required." *Id*. at 88 (emphasis in original). Standards contained in

informal documents are not exempt from the APA's notice-and-comment requirements. *See Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018) (citing *N.H. Hosp. Ass'n v. Azar,* 887 F.3d 69, 70-71 (1st Cir. 2018)).

94. The new standards adopted by USCIS are substantive rules requiring notice-and-comment rulemaking because they affect "rights, assign[] duties, or impose[] obligations." See N.H. Hosp. Ass'n, 887 F.3d at 70. In particular, on information and belief, USCIS promulgated new standards, under which: (1) applications of Afghans remaining in Afghanistan would be categorically denied or administratively closed; (2) Afghans outside of Afghanistan would no longer meet the urgent humanitarian reason prong of 8 U.S.C. § 1182(d)(5)(A), unless they either faced imminent harm in that country or an imminent risk of being returned to Afghanistan; and (3) with respect to Afghan applicants, USCIS would not enforce or abide by its written policy to require seeking additional information gathered through RFEs or NOIDs before issuing denials, even if there is a possibility that additional information will yield an approval.

95. USCIS's promulgation of new standards governing the Afghan humanitarian parole applications, without notice and comment, violated the APA. 5 U.S.C. § 553.

**COUNT IV**
**Violation of the APA, 5 U.S.C. § 706**
**Agency Action Unlawfully Withheld and/or Unreasonably Delayed**

96. The above paragraphs are incorporated by reference.

97. The APA mandates that an agency "shall conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). It also grants this Court the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

98. Plaintiffs have a clear right to apply for and receive a timely determination on their applications for parole for "urgent humanitarian reasons" under 8 U.S.C. § 1182(d)(5)(A), and USCIS has a duty to timely adjudicate the Plaintiffs' applications.

99. USCIS has unreasonably delayed and/or unlawfully withheld the adjudication of urgent applications filed by or on behalf of the Plaintiffs who have pending applications, in violation of the APA. See 5 U.S.C. §§ 555(b), 706(1).

## COUNT V
### Mandamus, 28 U.S.C. § 1361

100. The above paragraphs are incorporated by reference.

101. The Mandamus Act, 28 U.S.C. § 1361, grants authority to courts to compel defendants to perform a duty owed to a Plaintiff.

102. The Plaintiffs who have pending applications have a clear right receive a determination on their applications for humanitarian parole, USCIS has failed to discharge its mandatory duty to issue an adjudication, and those Plaintiffs lack an adequate remedy other than this litigation. Mandamus relief is therefore appropriate.

## COUNT VI
### Declaratory Judgment, 28 U.S.C. § 2201

103. The above paragraphs are incorporated by reference.

104. The Declaratory Judgment Act, 28 U.S.C. § 2201, grants authority to courts to "declare the rights and other legal relations of any interested party."

105. Plaintiffs are entitled to a declaration that USCIS has improperly changed its adjudication standards and ignored agency standards, rules, or procedures in its handling of Plaintiffs' and

others' applications for humanitarian parole on behalf of Afghan nationals, and—in the case of

the pending plaintiffs—that USCIS has unreasonably delayed and unlawfully withheld

adjudication of these applications.

**COUNT VII**
**Violation of FOIA, 5 U.S.C. § 552(a)(3)**
**Failure to Conduct an Adequate Search and to Disclose Responsive Records**

106. The above paragraphs are incorporated by reference.

107. Defendant is obligated under 5 U.S.C. § 552(a)(3)(A) to conduct a reasonable search for

records responsive to the FOIA Request and to promptly produce those records

108. Upon information and belief, Defendant has not conducted and not completed an adequate

search for responsive records to Plaintiff's FOIA request.

109. Plaintiffs have a legal right to obtain such records, and no legal basis exists for Defendant's

failure to search for them.

110. Defendant's failure to conduct a reasonable search for records responsive to the FOIA

Request violates, at a minimum, 5 U.S.C. § 552(a)(3)(C), as well as the regulations

promulgated thereunder.

**<u>PRAYER FOR RELIEF</u>**

The Plaintiffs request that the Court grant the following relief:

A. Order Defendants to promptly adjudicate each of the unadjudicated humanitarian parole

applications filed on behalf of any of the Plaintiffs in accordance with the standards in effect

on August 31, 2021 and the Policy Manual's provisions for the issuance of RFEs, NOIDs, and

denials;

B. Declare unlawful Defendant's failure to conduct an adequate search for the requested records, and failure to disclose the records requested by Plaintiffs;

C. Declare that USCIS's change in adjudication standards for Afghan humanitarian parole applications—including its decision not to grant applications on behalf of Afghans in Afghanistan, and its heightened standard for Afghans who fled Afghanistan—and its refusal to follow the Policy Manual's provisions for the issuance of RFEs, NOIDs, and denials, are arbitrary and capricious and not in accordance with law;

D. Set aside as arbitrary, capricious, and not in accordance with law, USCIS's heightened adjudication standard for Afghan humanitarian parole—including its decision not to grant applications on behalf of Afghans in Afghanistan, and its heightened standard for Afghans who fled Afghanistan—and its decision not to follow the Policy Manual's provisions for the issuance of RFEs, NOIDs, and denials;

E. Retain jurisdiction during the adjudication or re-adjudication of Plaintiffs' humanitarian parole applications in order to ensure compliance with the Court's orders;

F. Award Plaintiff reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E), the Equal Access to Justice Act, and any other applicable provision of law; and

G. Grant such other relief as the Court may deem just and proper.

Date: 10/25/2024

*/s/ Prerna Preshika Lal*
Prerna Preshika Lal*
Lal Legal APLC
2001 Addison St, STE 300
Berkeley CA 94704
Phone: (800) 552-5615
prerna@lallegal.com

Attorney for Plaintiffs

24

**<u>Exhibits</u>**

Exh. A: FOIA Request and Response

Exh. B: Receipts for Mohammad Walid and Nargias Ghafoori

Exh. C: Receipts for Mohammad Walid's Children

Exh. D: Receipts for Azilrahman Rahmani Family

Exh. E: Receipt for Shadab Shahab

## **DECLARATION OF SERVICE**

I hereby certify that on October 28, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve a copy of this document upon all counsel of record.

DATED this October 28, 2024, at Berkeley, California

/s/ Prerna P. Lal*
Lal Legal APLC
2001 Addison st, STE 300
Berkeley CA 94704
Phone: (800) 552-5616
prerna@lallegal.com

Attorney for Plaintiffs