Prerna Preshika Lal
Lal Legal APLC
2001 Addison St,
STE 300
Berkeley CA 94704
Phone: (800) 552-5616
prerna@lallegal.com


*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mohammad Anoosh Azizi, Soraya Azizi, Muzhgan Ali, Mohammad Walid Azizi, Nargis Ghafoori, Shahram Mohammad Azizi, Asayesh Azizi, Shadab Shahab, Azizalrahman Rahmani, Beheshta Rahmani, Husna Rahmani<br><br><br>        Plaintiffs,<br><br>v.<br><br><br>Kristi Nome, et. al.<br><br><br><br>                Defendants. | Case No.: 2:24-cv-02959 JDP<br><br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

LEGAL BACKGROUND ......................................................................................1

SUMMARY OF ARGUMENTS.............................................................................2

ARGUMENT..........................................................................................................4

I. Plaintiffs Have Standing To Bring This Action .................................................4

   A. U.S. citizen Plaintiffs have standing to sue as they have suffered tangible injuries.......4

   B. Afghan plaintiffs have standing to sue as they have suffered concrete, particularized and actual injuries .........................................................................................5

II. The APA Applies To Agency's Changes In Humanitarian Parole Policy, and These Changes Are Subject to Judicial Review ...............................................................8

   A. Section 1252(a)(2)(B)(ii) Does Not Strip The Court Of Jurisdiction Over Any of Plaintiffs' APA Claims. ........................................................................................9

      i. Section 1252's Jurisdictional Scope Is Limited to Removal Proceedings.................9

      ii. Section 1252(a)(2)(B)(ii) Does Not Bar Judicial Review of Procedural or Legal Errors....................................................................................................12

      iii. Section 1252(a)(2)(B)(ii) Does Not Preclude Judicial Review of Delay In Adjudication........................................................................................17

   B. Title 5, Section 701(a)(2) Does Not Strip The Court Of Jurisdiction Over Any of Plaintiffs' APA Claims. ......................................................................................19

   C. Plaintiffs Have Standing to Pursue Their FOIA Claim, and the Claim Was Properly Brought Against the Correct Defendants....................................................21

II. Plaintiffs Make Plausible Claims That Defendants' Policy Changes Violate The APA ....25

   A. Plaintiffs' APA Claims Are Plausible and Survive Rule 12(b)(6) Review, Especially in the Absence of an Administrative Record ........................................................24

      i. Changes In Parole Policies Are Arbitrary and Capricious In Violation of the APA25

      ii. USCIS Has Failed to Comply with Existing Law and Agency Rules In Violation of the APA...............................................................................26

      iii. USCIS Has Failed to Comply With the APA's Notice-and-Comment Requirements ........................................................................................26

      iv. USCIS Has Unreasonably Delayed Adjudications of Afghan Parole Applications ........................................................................................27

   B. Defendants' Mischaracterization of Plaintiffs' Allegations and Unlawful Policy Shift Violate Statutory and Humanitarian Parole Requirements ................................28

      i. Defendants' Cannot Hide Behind the Cloak of Necessity.......................................28

      ii. USCIS's Policy Change Violates Statutory Parole Requirements and Case-by-Case Adjudication Mandate .....................................................30

      iii. USCIS's Refusal to Issue RFEs and NOIDs for Afghan Applicants Violates Policy and Fair Adjudication Practices ...........................................................32

-

iv. The Foreign Affairs Exception Does Not Apply In This Case...............................34

v. USCIS's Deterrence Policy Contradicts Statutory Parole Requirements...............37

C. TRAC Factors Favor Plaintiffs .........................................................................39

i. The Delay Is Unreasonable Under the "Rule of Reason"........................................39

ii. Congressional Intent Supports Expediting Applications.........................................40

iii. Human Health and Welfare Favors Plaintiffs.......................................................40

iv. Expediting Adjudication Would Not Disrupt Higher-Priority Agency Activities .40

v. Plaintiffs Are Prejudiced by the Delay .................................................................41

vii. The Delay Is Due to Agency Inefficiency, Not Unprecedented Surge.................41

**CONCLUSION** ..........................................................................................................**42**

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

1

# TABLE OF AUTHORITIES

2

3    **CASES**

4    *A Better Way for BPA,*
5    890 F.3d 1186 (9th Cir. 2018)……………………………………………………...22

6    *Amalkalani v. McAleenan,*
7    527 F. Supp. 3d 205 (E.D.N.Y. 2021) …………………………………………….27

8    *Aracely, R. v. Nielsen,*
     319 F. Supp. 3d 110  (D.D.C. 2018) …………………………………………...15, 21
9
10   *Arizona Dream Act Coalition v. Brewer,*
     757 F.3d 1053 (9th Cir. 2014) …………………………………………………….6

11   *Asarco, Inc. v. EPA,*
12   616 F.2d 1153, 1159 (9th Cir. 1980) …………………………………………...…4

13   *Ashcroft v. Iqbal,*
14   556 U.S. 662 (2009) ………………………………………….................24

15   *Atieh v. Riordan,*
16   727 F.3d 73 (1st Cir. 2013) ………………………………………………...…24

     *Bell Atl. Corp. v. Twombly,*
17   550 U.S. 544 (2007) …………………………………………….................24
18
     *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson,*
19   814 F.3d 481 (1st Cir. 2016) …………………………………………….....16
20
     *Biden v. Texas,*
21   142 S. Ct. 2528 (2022) ………………………………………………...............15

22   *Block v. Cmty. Nutrition Inst.,*
23   467 U.S. 340 (1984)………………………………………………………………13

24   *Camp v. Pitts,*
     411 U.S. 138 (1973)…………………………………………………………….4
25
26   *Data Processing Serv. v. Camp,*
     397 U.S. 150 (1970)………………………………………………………………13
27
28   *Davis v. Michigan Dep't of Treasury,*
     489 U.S. 803 (1989)……………………………………………………………10, 11

*Department of Homeland Security v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020).………………………………………………………………1

*Doe v. Mayorkas*,
530 F. Supp. 3d 893 (N.D. Cal. 2021).…………………………………………8, 12

*Doe v. Trump*,
288 F. Supp. 3d 1045 (W.D. Wash. 2017).………………………………………17

*Dong v. Chertoff*,
513 F. Supp. 2d 1158 (N.D. Cal. 2007).…………………………………………18

*Drake v. Obama*,
664 F.3d 774 (9th Cir. 2011).……………………………………………………...23

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021).……………………………………………………35

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018).……………………………………………………34

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).…………………………………………………………..37, 38

*Gianni v. Curda*,
No. 2:07-cv-1478 GEB KJM, 2008 WL 479991 (E.D. Cal. Feb. 19, 2008)…………………18

*Gomez-Sanchez v. Sessions*,
892 F.3d 985 (9th Cir. 2018).…………………………………………………14

*Guerrero-Lasprilla v. Barr*,
140 S. Ct. 1062 (2020).…………………………………………………………9, 13

*Haydary v. Garland*,
No. 4:24 CV 836 JMB, 2024 WL 4880406 (E.D. Mo. Nov. 25, 2024)…………………………15

*Heckler v. Chaney*,
470 U.S. 821 (1985).……………………………………………………………20

*Hernandez v. Ashcroft*,
345 F.3d 824 (9th Cir. 2003).…………………………………………………14

*Iddir v. INS*,
301 F.3d 492 (7th Cir. 2002).…………………………………………………17

*In re A Cmty. Voice*,

878 F.3d 779 (9th Cir. 2017)……………………………………………..……39

*In re Core Commc'ns, Inc.,*
531 F.3d 849 (D.C. Cir. 2008)………………………………………………...40

*Indep. Mining Co., Inc. v. Babbitt,*
105 F.3d 502 (9th Cir. 1997)……………………………………………………39

*J.E.F.M. v. Lynch,*
837 F.3d 1026 (9th Cir. 2016) ……………………………………………………11

*Judicial Watch, Inc. v. U.S. Dep't of Justice,*
365 F.3d 1108 (D.C. Cir. 2004)…………………………………………………22

*Kleindienst v. Mandel,*
408 U.S. 753 (1972)……………………………………………………………….7

*Kucana v. Holder,*
558 U.S. 233 (2010)………………………………………………...9, 11, 13, 18

*LaMarche v. Mayorkas,*
3:23-cv-30029-MGM (D. Mass. Mar. 8, 2023)………………………………14

*Leonard v. Clark,*
12 F.3d 885 (9th Cir. 1993)………………………………………………………4

*Lincoln v. Vigil,*
508 U.S. 182 (1993)……………………………………………………………19

*Liu v. Chertoff,*
2007 WL 2433337 (E.D. Cal. Aug. 22, 2007)..………………………………18

*Mach Mining, LLC v. EEOC,*
575 U.S. 480 (2015)……………………………………………………………...13

*Make The Rd. N.Y. v. Wolf,*
962 F.3d 612 (D.C. Cir. 2020)………………………………………………...13

*Mantena v. Johnson,*
809 F.3d 721 (2d Cir. 2015)………………………………………………………6

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
336 F.3d 1094 (D.C. Cir. 2003)……………………………………….…...39, 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)…………………………………………………….…...25, 37

*Nakka v. U.S. Citizenship & Immigr. Servs.*,
111 F.4th 995 (9th Cir. 2024)....................................................................12

*Nat'l Venture Capital Ass'n v. Duke*,
291 F. Supp. 3d 5 (D.D.C. 2017)..................................................................7

*Pareto v. FDIC*,
139 F.3d 696 (9th Cir. 1998)......................................................................24

*Patel v. Facebook, Inc.*,
932 F.3d 1264 (9th Cir. 2019)......................................................................4

*Patel v. Garland*,
142 S. Ct. 1614 (2022)........................................................................10, 11

*Patel v. Reno*,
134 F.3d 929 (9th Cir. 1997)......................................................................17

*Razaq v. Poulos*,
2007 WL 61884 (N.D.Cal.2007)..................................................................40

*Ramirez v. U.S. Immigr. & Customs Enforcement*,
338 F. Supp. 3d 1 (D.D.C. 2018)..................................................................8

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
140 S. Ct. 1891 (2020) ...................................................................1, 19, 30

*Remmie v. Mabus*,
846 F. Supp. 2d 91 (D.D.C. 2012) ..............................................................24

*R.F.M. v. Nielsen*,
365 F. Supp. 3d 350 (S.D.N.Y. 2019) ..........................................................21

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ..............................................................21

*Roe v. Biden*,
2023 WL 346637 (D.D.C. Jan. 20, 2023) ......................................................36

*Roe v. Mayorkas*,
No. 22-cv-10808-ADB, 2023 WL 346637 (D. Mass. Apr. 28, 2023) ......................14

*Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
783 F.3d 156 (3d Cir. 2015) ....................................................................6, 7

*Shihuan Cheng v. Baran,*
No. CV 17-2001-RSWL-KSx, 2017 WL 3326451 (C.D. Cal. Aug. 3, 2017)........................21

*Sierra Club v. United States EPA,*
762 F.3d 971 (9th Cir. 2014)...........................................................................4

*Singh v. Holder,*
638 F.3d 1196 (9th Cir. 2011)........................................................................14

*Soltane v. U.S. Dep't of Justice,*
381 F.3d 143 (3d Cir. 2004).........................................................................18

*Spencer Enters.,* Inc. v. U.S.,
345 F.3d 683 (9th Cir. 2003).........................................................................14

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016)...............................................................................5, 6

*Su v. Mayorkas,*
698 F. Supp. 3d 1168 (N.D. Cal. 2023)...............................................................39

*Telecommunications Research & Action Center* v. FCC (TRAC),
750 F.2d 70 (D.C. Cir. 1984)....................................................................passim

*Town of Wellesley,*
829 F.2d 275 (1st Cir. 1987).......................................................................27, 28

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190  (2021).............................................................................4

*Trump v. Int'l Refugee Assistance Project,*
137 S. Ct. 2080 (2017)...............................................................................5

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
718 F.3d 1006  (9th Cir. 2013)......................................................................24

*Union of Concerned Scientists v. Wheeler,*
954 F.3d 11 (1st Cir. 2020).........................................................................19

*Warren v. Fox Family Worldwide, Inc.,*
328 F.3d 1136  (9th Cir. 2003).......................................................................6

*Watt v. Energy Action Educ. Found.,*
454 U.S. 151 (1981).................................................................................4

*Weisbuch v. Cnty. of Los Angeles,*

119 F.3d 778 (9th Cir. 1997) ………………………………………………………24

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
139 S. Ct. 361  (2018)…………………………………………………………………19

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980)……………………………………...…………34

*Ziae v. Garland*,
No. 3:24-cv-1122-S-BT, 2024 WL 5173318 (N.D. Tex. Dec. 19, 2024)…………………………15

**STATUTES**

5 U.S.C. § 553…………………………………………………………………27, 34
5 U.S.C. § 555(b)………………………………………………………17, 27, 41
5 U.S.C. § 701(a)(2)……………………………………………………………19, 20
5 U.S.C. § 702……………………………………………………………………2, 7
5 U.S.C. § 706……………………………………………………………………...26
5 U.S.C. § 706(1)…………………………………………………………………27
5 U.S.C. § 706(2)(A)………………………………………………2, 32, 34, 37
8 U.S.C. § 1182(d)(5)(A)…………………………………………………passim
8 U.S.C. § 1252(a)(2)(B)(ii)………………………………………………passim
8 U.S.C. § 1252(a)(2)(D)……………………………………………………10, 13
8 U.S.C. § 1252(a)(5)………………………………………………………………11
8 U.S.C. § 1252(b)(9)………………………………………………………………11

**REGULATIONS**

8 C.F.R. § 212.5(c)………………………………………………………………26

**RULES**

Fed. R. Civ. P. Rule 12(b)(1)………………………………………………2, 7, 42
Fed. R. Civ. P. Rule 12(b)(6)……………………………………………………passim

**OTHER AUTHORITIES**

USCIS Policy Manual, Vol. 1, Ch. 8, § D………………………………………25
USCIS Policy Manual, Vol. 1, Ch. 9, § B.3……………………………………26
USCIS Policy Manual, Vol. 1, Part E, Ch. 6……………………………………33
USCIS Policy Memorandum, PM-602-0085 (June 3, 2013)…………………………25
USCIS Policy Alert, PA-2021-11 (June 9, 2021)…………………………………25
U.S. Customs & Border Prot., CBP Releases October 2024 Monthly Update
(Nov. 11, 2024)…………………………………………………………………29
U.S. Customs & Border Prot., CBP Releases December 2024 Monthly Update
(Jan. 14, 2025)…………………………………………………………………42

# INTRODUCTION

Immigration law mandates that noncitizens adhere strictly to procedural requirements when seeking relief from the Department of Homeland Security ("DHS"), and the Administrative Procedure Act ("APA") similarly requires the DHS to follow precise and fair procedures when modifying the standards governing such applications. *See Department of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). This principle applies even when the DHS alters standards for discretionary relief, as in this case, and it holds particular significance when such changes can have life-or-death consequences.

This case involves a challenge to the U.S. Citizenship and Immigration Services' ("USCIS") policies and practices regarding the adjudication of humanitarian parole applications filed by Afghan nationals following the Taliban's resurgence in Afghanistan in August 2021. Plaintiffs, U.S. citizens and their Afghan family members, allege that USCIS implemented new, stricter standards for adjudicating Afghan parole applications without notice or justification, akin to a bait and switch, resulting in arbitrary denials, unreasonable delays, and violations of the APA, 5 U.S.C. § 701 et seq. Humanitarian parole, authorized under 8 U.S.C. § 1182(d)(5)(A), allows the Secretary of Homeland Security to temporarily admit individuals into the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Plaintiffs argue that USCIS's abrupt policy changes and delays in adjudicating their applications have created significant barriers to safety for Afghan allies, underscoring the critical importance of procedural fairness in matters with profound human consequences.

# LEGAL BACKGROUND

The APA provides a framework for judicial review of agency actions, requiring agencies to adhere to procedural fairness and prohibiting arbitrary, capricious, or unlawful conduct. Under

the APA, individuals "adversely affected or aggrieved by agency action" are entitled to judicial review. 5 U.S.C. § 702. Courts may set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs assert that the new standards for humanitarian parole are unlawful under the APA for several reasons: they are arbitrary and capricious (Count I); they conflict with USCIS's own policies and the humanitarian parole statute (Count II); they were implemented without complying with notice-and-comment requirements (Count III); and they result in unreasonable delays in adjudication. (Counts IV and V). Plaintiffs also contend that they have not been provided with the results of their information request concerning the program filed over 9 months ago, which is directly pertinent to the claims herein, and would prove their claims. (Count VII).

Defendants seek dismissal of the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that the court lacks jurisdiction to review discretionary parole decisions under 8 U.S.C. § 1252(a)(2)(B)(ii), which limits judicial review of certain immigration decisions. Defendants also contend that Plaintiffs lack standing and that the claims are not ripe for review. Plaintiffs counter that their claims are not about the merits of individual parole decisions but rather about the legality of USCIS's procedures and policies, which are subject to judicial review under the APA. They further argue that the delays in adjudication and the policy changes have caused concrete injuries, including prolonged separation from family members and exposure to life-threatening conditions in Afghanistan.

## SUMMARY OF ARGUMENTS

Defendants argue that the court lacks jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii), which limits judicial review of discretionary immigration decisions. However, Plaintiffs are not challenging the discretionary denial of parole but rather the *procedural f*airness and legality of

USCIS's policy changes and delays. The APA provides a clear basis for judicial review of these claims. Plaintiffs have standing because they have suffered concrete injuries, including the denial of a meaningful opportunity to be considered for parole and the prolonged separation from family members facing life-threatening conditions.

Plaintiffs allege that USCIS's new standards for adjudicating Afghan parole applications are arbitrary and capricious under the APA. The abrupt policy changes, including the denial or administrative closure of applications for beneficiaries in Afghanistan and the blanket refusal to issue Requests for Evidence ("RFEs") or Notices of Intent to Deny ("NOIDs"), lack a reasoned explanation and violate USCIS's own policies and the humanitarian parole statute.

Plaintiffs argue that USCIS failed to comply with the APA's notice-and-comment requirements when implementing the new standards. The policy changes, which significantly alter the adjudication process for Afghan parole applications, constitute substantive rules that require public notice and comment. Moreover, Defendants' reliance on the foreign affairs exception is misplaced, as the changes primarily involve domestic immigration adjudication rather than foreign policy.

Plaintiffs contend that USCIS's delays in adjudicating their parole applications are unreasonable under the APA. The delays have caused significant harm, including prolonged exposure to life-threatening conditions and the inability to reunite with family members in the United States. The *TRAC* factors, which courts use to assess unreasonable delay, weigh heavily in Plaintiffs' favor, particularly given the urgent humanitarian needs at stake.

Defendants mischaracterize Plaintiffs' claims by arguing that they seek a right to be granted parole. In reality, Plaintiffs challenge the procedures used to implement the new standards, asserting their right to fair and lawful processes under the APA. Defendants' motion to dismiss is

premature, as they have failed to produce an administrative record to support their arguments. This principle is rooted in the requirement that judicial review of agency action must be based on the record before the agency at the time of its decision. *See* 5 U.S.C. § 706; *see, e.g., Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159 (9th Cir. 1980) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss. Plaintiffs have standing, the Court has jurisdiction, and the Complaint asserts valid claims under the APA. Defendants' arguments fail to address the core issues of procedural fairness and the legality of USCIS's policy changes and delays, which have profound human consequences for Plaintiffs and their Afghan family members.

## **ARGUMENT**

### I.  **Plaintiffs Have Standing to Bring This Action**

Defendants' motion to dismiss for lack of standing should be denied because, under binding Supreme Court precedent, so long as one petitioner has standing, the proceeding may go forward without any consideration of the standing of co-petitioners. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("As long as one of the petitioners has standing, we need not consider the standing of the others"); *Sierra Club v. United States* EPA, 762 F.3d 971, 976 (9th Cir. 2014) ("[O]nly one [plaintiff] must establish standing to enable review"). "[O]nce the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).

### A.  **U.S. citizen Plaintiffs have standing to sue as they have suffered tangible injuries**

With respect to injuries, tangible injuries, like physical harm or monetary losses, are concrete. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). But "[a] concrete injury need not be tangible." *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019). As explained

by the Supreme Court, an intangible injury may be concrete if it presents a material risk of tangible harm or "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," like common law torts or certain constitutional violations. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 340–41 (2016); *see also TransUnion*, 141 S. Ct. at 2204.

Here, multiple U.S. citizen Plaintiffs such as Mohammad Anoosh Azizi and Soraya Azizi have standing to bring this claim because they have suffered both tangible and intangible injuries. Specifically, the humanitarian parole applications they filed and paid for on behalf of their Afghan family members remain pending due to the unlawful policies and practices of USCIS. This lengthy delay in adjudication has caused Plaintiffs a direct harm, as they have incurred monetary loss due to the lack of adjudication. Additionally, the long delays in adjudicating parole applications exposes their family members to tangible harm from the Taliban. *Cf. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2089 (2017) (per curiam) ("Trump v. IRAP") ("An American individual . . . that has a bona fide relationship with a particular person seeking to enter the country . . . can legitimately claim concrete hardship if that person is excluded."). For example, Mr. Azizi describes in his sworn statement that while trying to evade the Taliban, his newborn nephew died tragically. Compl. ¶¶ 3; *See also* Exh. A. These tangible injuries are fairly traceable to USCIS's actions and can be redressed by a favorable decision from this Court, which would compel USCIS to adhere to lawful policies and practices in processing these applications. Accordingly, the Court need not—and should not—address the standing of the Afghan Plaintiffs. With the standing of at least some U.S. citizen Plaintiffs established, this Court may adjudicate all of their claims.

**B. Afghan plaintiffs have standing to sue as they have suffered concrete, particularized and actual injuries**

However, Defendants' assertion that the Afghan Plaintiffs in this suit do not have standing is also incorrect. To demonstrate standing, a plaintiff must show that she has suffered "an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A court must liberally construe the complaint and accept well-pleaded facts as true when evaluating motions under rule 12(b)(1) and rule 12(b)(6). *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("In reviewing a motion to dismiss under Rule 12(b)(6), we must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party.") In other words, when considering whether a Plaintiff has Article III standing, a federal court must assume the merits of her legal claim.

Here, even Afghan Plaintiffs who are currently overseas have standing because they have suffered injury that is concrete, particularized, and actual: (1) the extinguishment of an opportunity to pursue humanitarian parole according to a process that comports with the law, (2) undue delay in violation of the APA, and (3) ongoing and extreme hardship and risk to life caused by Defendants' unlawful process and/or undue delay in adjudication. Indeed, several circuit courts of appeals, including the Ninth Circuit, have recognized "lost opportunity" injury as sufficient to confer Article III standing in immigration cases. See*, e.g., Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053,1061-1063 (9th Cir. 2014) ("The plaintiffs have alleged that they are eligible for DACA and would apply for it but for the state's policy. This lost opportunity constitutes an injury in fact"); *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015) (recognizing lost opportunity as basis for standing, where beneficiary did not receive notice of intent to revoke visa and challenged procedural defects in agency's conduct); *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 162 (3d Cir. 2015) (recognizing lost opportunity where a visa

petition was denied for unlawfully present immigrant beneficiary). These cases illustrate that the "lost opportunity" doctrine is a viable basis for non-citizens such as the Afghan Plaintiffs to establish Article III standing.

Defendants also state incorrectly that noncitizens lack standing because they "have no right of entry to the United States." Mot. at 9. However, the cases cited address the scope of noncitizens' constitutional rights in relation to executive action on specific visa applications. Here, Plaintiffs are not asserting a right to judicial review of individual parole decisions on the merits, nor are they making a constitutional claim akin to those at issue in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and its cited progeny. They do not contest the outcome of any discretionary decision. Instead, Plaintiffs are challenging USCIS's delay in adjudicating Afghan humanitarian parole applications, as well as its policy decision to adopt and implement new standards and procedures for processing these applications. They argue that these actions are improper and unlawful under the APA because these claims fall under the legal framework Congress established, which allows any "person suffering legal wrong because of agency action" to seek relief. 5 U.S.C. § 702.

Courts have emphasized a key distinction in cases like this one: the difference between challenging an agency's exercise of discretion and challenging an overarching agency policy. *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 13 (D.D.C. 2017) ("*Duke*") (finding standing in a case involving parole under 8 U.S.C. § 1182(d)(5)(A)). The latter type of challenge—like the one here—focuses on agency action that deprives plaintiffs of the opportunity to obtain any outcome through a lawful process, rather than a specific outcome, as the Defendants suggest. In this case, the alleged injury is not the denial of Plaintiffs' individual applications but rather the *lost opportunity* to have their applications reviewed under a lawful process, regardless of the ultimate

discretionary decision. *Doe v. Mayorkas*, 530 F. Supp. 3d 893, 904 (N.D. Cal. 2021) (citations omitted).

This principle has been recognized in several district court cases specifically involving humanitarian parole, in which the courts agreed that the loss of opportunity to seek parole due to challenged policy changes "suffice[d] to establish a cognizable injury" conferring standing to sue. *Duke,* 291 F. Supp.3d at 14; *see also Ramirez v. U.S. Immigr. & Customs Enforcement*, 338 F.Supp. 3d 1, 24 (D.D.C. 2018) (relying on *Duke* in concluding that plaintiffs "identified cognizable injuries in the form of the loss of opportunity for consideration" under existing legal standard in the face of the agency's systematic and widespread failure to comply with that standard in making individual decisions).

The non-citizen Afghan plaintiffs have standing to bring this challenge because USCIS has deprived them of the fundamental opportunity to seek humanitarian parole through a lawful process, regardless of whether their applications are ultimately denied or left in limbo. This deprivation alone is sufficient to establish standing. Moreover, the plaintiffs face severe and ongoing hardships directly caused by USCIS's unlawful actions. Several plaintiffs have already endured horrific violence, including lethal attacks by the Taliban or their allies, targeting either themselves or their close colleagues and loved ones. These immediate and life-threatening risks not only highlight the urgency of their claims but also reinforce their standing to challenge the government's conduct. The stakes are nothing less than their safety, survival, and the right to a fair and lawful process.

## II.    The APA Applies to Agency's Changes in Humanitarian Parole Policy, and These Changes Are Subject to Judicial Review

Faced with a complaint that exposes clear violations of the APA and the resulting human suffering endured by Afghan nationals, Defendants argue that this Court is powerless to intervene.

The APA explicitly allows lawsuits by individuals who are "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. There is a long-standing "presumption favoring judicial review of administrative action" that "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (citations omitted). The Supreme Court has emphasized that it has "consistently applied" this presumption "to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction" including 8 U.S.C. § 1252(a)(2)(B)(ii). *Kucana v. Holder*, 558 U.S. 233, 251 (2010) (citations omitted).

Yet, Defendants assert that Congress has given them unchecked authority to act as they see fit in matters related to humanitarian parole standards, rules, and policies. Under this logic, USCIS could impose absurd requirements, such as mandating that applications be hand-delivered to Washington, D.C., or rejecting applications based on arbitrary deadlines. Worse, it could simply ignore these applications altogether after collecting millions in fees—a scenario that seems to be playing out here. Defendants' position suggests that no level of arbitrariness or harm to applicants would make their actions subject to APA review. As outlined below, Defendants rely on two flawed jurisdictional arguments. Both fail to recognize the critical distinction between challenging the denial of individual relief and challenging systemic changes to agency policy and practice.

**A. Section 1252(a)(2)(B)(ii) Does Not Strip the Court of Jurisdiction Over Any of Plaintiffs' APA Claims.**

*i. Section 1252's Jurisdictional Scope Is Limited to Removal Proceedings*

Defendants assert that § 1252(a)(2)(B)(ii) precludes judicial review under 5 U.S.C. § 701(a)(1), and precludes a review in this case. Mot. at 13-16. However, entitled "Judicial review of orders of removal" 8 U.S.C. § 1252 only concerns judicial review of removal orders and agency determinations made on cases in removal proceedings, a fact made clear not only by the section's

title but also by its content and context. The clause in (a)(2)(B)(i) must thus be read in that context and it is inapplicable to this context.

Defendants' claim that 8 U.S.C. § 1252 applies to all discretionary decisions requires the Court to ignore "a fundamental canon of statutory construction": "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989); *see also Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (looking to "§ 1252(a)(2)(B)(i)'s text and context" to ascertain the meaning of "judgment" in that subsection). A court should not "examine[] [the text] in isolation," as "statutory language cannot be construed in a vacuum." *Davis*, 489 U.S. at 809.

Here, the context of § 1252(a)(2)(B) confirms its scope. First, the section within which this subparagraph can be found is entitled "Judicial review of orders of removal." 8 U.S.C. § 1252. This section outlines the availability and scope of judicial review for various types of *removal orders.* Paragraph (a)(1) concerns "[g]eneral orders of removal" in proceedings before immigration judges. The subparagraphs preceding and following § 1252(a)(2)(B) similarly address removal orders: § 1252(a)(2)(A) concerns orders of expedited removal entered by Department of Homeland Security (DHS) officers, and § 1252(a)(2)(C) concerns orders of removal against noncitizens who have committed certain criminal offenses. *Id*. § 1252(a)(2)(A), (C); *see also Patel*, 142 S. Ct. at 1625 (looking to subparagraph (C) in analyzing the "context" of subparagraph (B)). In addition, the language of § 1252(a)(2)(D) expressly authorizes judicial review of "constitutional claims or questions of law raised upon a petition for review," notwithstanding the limitations outlined in, inter alia, "subparagraph (B) or (C)." 8 U.S.C. § 1252(a)(2)(D). Paragraph (a)(5) clarifies that "a petition for review filed . . . in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision

of this chapter." *Id*. § 1252(a)(5); *see also id*. §1252(a)(3) (4) (further specifying the judicial review authority for specific claims raised in removal proceedings).

Subsection (b) of § 1252 only further underscores that the scope of the section is limited to the removal context. It is entitled "Requirements for review of orders of removal," and it outlines the procedure for appealing a final order of removal via a petition for review. See, *e.g.*, *id*. § 1252(b)(2) (explaining that the proper venue for a petition for review is "the court of appeals for the judicial circuit in which the immigration judge completed the [removal] proceedings"), *id*. § 1252(b)(3)(A) (requiring service of the petition on the DHS office in charge of the district "in which the final order of removal . . . was entered"), *id*. § 1252(b)(4)(A) (noting that the court of appeals must "decide the petition only on the administrative record on which the order of removal is based"). And as the Ninth Circuit has explained, § 1252(b)(9), along with § 1252(a)(5), "channel[s] judicial review over final orders of removal to the courts of appeals." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016)

The Supreme Court, moreover, expressly declined to hold that § 1252(a)(2)(B)(i) extends to USCIS decisions concerning individuals who are not in removal proceedings. *See Patel,* 142 S. Ct at 1626 ("The reviewability of [USCIS] decisions is not before us, and we do not decide it.") In sum, the language of § 1252 makes clear the section is directed to judicial review of removal orders and determinations underlying those removal orders. When "read in th[is] context and with a view to their place in the overall statutory scheme," § 1252(a)(2)(B)'s restrictions on judicial review, too, are clearly intended to be limited to the removal context. *Davis*, 489 U.S. at 809; *see also Kucana,* 558 U.S. at 245–46 (2010) (instructing courts to "not look merely to a particular clause, but consider [it] in connection with . . . the whole statute" and analyzing subparagraph (B)'s reach and scope in light of its "statutory placement" (citation omitted)).

To assert that § 1252(a)(2)(B)(i) applies more broadly, Defendants point to the language in § 1252(a)(2)(B) stating that "regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review [certain specified actions]." 8 U.S.C. § 1252(a)(2)(B). But Defendants take this language out of its context, ignoring that it is discussing cases in removal proceedings. This language refers to those decisions that are not made by an immigration judge, yet which still bear directly on the removal process. Under § 1252(a)(2)(B), a respondent cannot separately challenge such judgments, decisions, or actions, except through the petition for review process laid out in § 1252 after a final order of removal is issued. This is important because in many removal cases, USCIS regularly makes decisions that directly affect their outcome. Even though those USCIS decisions are not "made in removal proceedings," 8 U.S.C. § 1252(a)(2)(B), they directly affect the "granting of relief" from removal, *id*. § 1252(a)(2)(B)(i). Therefore, the Section 1252 does not apply here as the Plaintiffs in this case are not in removal proceedings, and the agency adjudication (or lack thereof) at issue here falls outside the statutory judicial review scheme for removal cases laid out in § 1252(a).

  ii.  *Section 1252(a)(2)(B)(ii) Does Not Bar Judicial Review of Procedural or Legal Errors*

In light of the statutory text and case law, Section 1252(a)(2)(B)(ii) does not bar any of Plaintiffs' claims because they do not challenge the discretionary denial of any individual's application for humanitarian parole, but instead the legality of the standards that the government uses to adjudicate those applications. *Nakka v. U.S. Citizenship &Immigr. Servs.*, 111 F.4th 995, 996 (9th Cir. 2024) ("1252(a)(2)(B)(i) does not categorically strip federal district courts of jurisdiction to hear Plaintiffs' claims, which challenge generally applicable agency policies without referring to or relying on denials of individual applications for relief."); *Doe,* 530 F.Supp.3d at 904 (finding that § 1252(a)(2)(B)(ii) "applies to decisions made to individual

applications" and was not applicable to a "challenge of immigration policy" (emphasis omitted)). Moreover, in *Kucana v. Holder*, 558 U.S. 233, 251–52 (2010), the Supreme Court held that § 1252(a)(2)(B)(ii) does not preclude judicial review of procedural or legal questions, even in discretionary contexts, reaffirming the "well-settled" presumption favoring judicial review of administrative action.

This presumption in favor of judicial review applies even to statutes intended to limit review, and Congress is presumed to legislate against this backdrop. Overcoming the presumption requires "clear and convincing evidence." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020). Demonstrating that "Congress prohibited all judicial review" is a "heavy burden," requiring "clear and convincing evidence" of such intent, which must be "fairly discernible in the statutory scheme." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (quoting *Data Processing Serv. v. Cam*p, 397 U.S. 150, 157 (1970)).

In plain terms, the jurisdictional limitations in § 1252(a)(2)(B) apply only to denials of discretionary relief on the merits of an individual's case, not to broader policies, practices, or legal questions. The statute explicitly preserves judicial review for constitutional claims and questions of law under § 1252(a)(2)(D). Congress added this carveout in response to the Supreme Court's skepticism of a provision that would improperly limit judicial review of constitutional claims or questions of law—exactly what the government is attempting to do here. *See Guerrero Lasprilla*, 140 S. Ct. at 1071–73 (recounting history leading to enactment). Courts, including the Ninth Circuit, have consistently held that this carveout allows review of legal issues, even in discretionary contexts. Congress added this exception to prevent improper limits on judicial review of legal and constitutional claims, which is precisely what the Defendants are trying to circumvent here. *Id.*

The Ninth Circuit has also consistently held that Section 1252(a)(2)(B)(ii) does not bar judicial review where the adjudicator made a legal error or applied an incorrect standard. *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 994-995 (9th Cir. 2018) (BIA decision reversed because court applied precedent incorrectly); *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) ("§ 1252(a)(2)(B)(ii) . . . does not limit habeas jurisdiction over questions of law . . . . including . . . 'mixed questions of law and fact.'"); *Hernandez v. Ashcroft*, 345 F.3d 824, 846 (9th Cir. 2003) (holding that the BIA's discretionary denial of adjustment of status was unlawful); *Spencer Enters., Inc. v. U.S.*, 345 F.3d 683, 689 (9th Cir. 2003) (even if the statute gives the attorney general discretion, courts still retain jurisdiction to review whether the decision is ultra vires); These court decisions emphasize that challenges to the lawfulness of agency action are reviewable, even if the underlying decision involves discretion.

The Court should also take note of recent district court decisions addressing the Afghanistan parole program, which have held that § 1252(a)(2)(B)(ii) does not bar all judicial review of agency action under § 1182(d)(5)(A). See, *e.g., LaMarche v. Mayorkas*, 3:23-cv-30029-MGM (D. Mass. Mar. 8, 2023) (denying Defendants' Motion to Dismiss (Dkt. 19)); *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 346637 (D. Mass. Apr. 28, 2023) (order denying defendant's motion to dismiss in part and ordering defendant to produce the administrative record expeditiously). These decisions underscore the availability of judicial review in analogous contexts, reinforcing Plaintiffs' position. Notably, Defendants have failed to bring these relevant cases to the Court's attention, despite their obligation to cite persuasive authority and relevant case law. They do not attempt to illustrate how these cases are less compelling than cases they do cite from the 8th and 5th circuits. This omission further supports the need for this Court to independently consider the applicability of § 1252(a)(2)(B)(ii) in light of these precedents.

Defendants' reliance on *Haydary v. Garland* No. 4:24 CV 836 JMB, 2024 WL 4880406 (E.D. Mo. Nov. 25, 2024) and *Ziae v. Garland*, No. 3:24-cv-1122-S-BT, 2024 WL 5173318 (N.D. Tex. Dec. 19, 2024) is misplaced and fails to address the critical distinction between challenges to individual discretionary decisions and challenges to systemic agency policies and practices. The cases cited by Defendants involve courts conflating and confusing individual parole decisions, which are indeed subject to the jurisdictional limitations of 8 U.S.C. § 1252(a)(2)(B)(ii), with challenges to systemic agency policies and practices. For example, in *Haydary v. Garland*, the Eastern District of Missouri conflated USCIS's inaction on a parole application with a decision to not expedite the application and found that § 1252(a)(2)(B)(ii) foreclosed judicial review. *Haydary v. Garland*, No. 4:24 CV 836 JMB, 2024 WL 4880406, at *8-9 (E.D. Mo. Nov. 25, 2024). Similarly, in *Ziae v. Garland*, the court applied Fifth Circuit precedent to the case stating that "§ 1252(a)(2)(B)(ii) strips federal courts of jurisdiction to review any discretionary *decision or action* rendered by the Attorney General." *Ziae v. Garland*, No. 3:24-cv-1122-S-BT, 2024 WL 5173318, at *6-7 (N.D. Tex. Dec. 19, 2024). However, Plaintiffs in this case are not challenging individual parole decisions but are instead challenging the systemic unlawful policies and practices adopted by USCIS that have resulted in unreasonable delays and violations of the APA. Where plaintiffs challenge policies, procedures, or standards governing parole determinations, courts disagree with the government that Congress stripped their jurisdiction. See, *e.g., Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 136 (D.D.C. 2018).

Moreover, discretionary agency actions must still comply with the APA. *See Biden v. Texas*, 142 S. Ct. 2528, 2543–44 (2022) (emphasizing that discretionary decisions must adhere to statutory and procedural requirements); In sharp contrast with the Defendants' sweeping arguments, the Court explained that parole "authority is not unbounded: [the agency] may exercise

its discretion to parole applicants 'only' . . .within th[e] statutory framework" set forth in the humanitarian parole statute. *Id.* (emphasis added). Further, "under the APA," any exercise of discretion regarding humanitarian parole "must be reasonable and reasonably explained." *Id.* at 17-18. As the Supreme Court itself has acknowledged: judicial review of claims alleging violations of the APA with respect to humanitarian parole policies, like those advanced here, is available. Thus, even in the context of humanitarian parole, courts retain jurisdiction to ensure that agency actions are not arbitrary, capricious, or contrary to law.

Some courts have ruled that § 1252(a)(2)(B)(ii) bars judicial review of individual parole decisions, such as the final decision to grant or deny parole to a specific applicant. For example, in *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, the First Circuit held that courts cannot review the discretionary denial of a visa for an individual employee. 814 F.3d 481, 483 (1st Cir. 2016). Similarly, other cases in other jurisdictions cited by the Defendants only prevent courts from second-guessing the agency's balancing of merits in individual cases. However, these cases do not bar judicial review when plaintiffs challenge broader policies or practices, rather than individual decisions

In short, § 1252(a)(2)(B)(ii) applies to individual discretionary decisions, not to broader legal or policy challenges. Courts have consistently held that challenges to the legality of agency action—such as violations of the APA, statutory authority, or constitutional rights—are not barred by § 1252(a)(2)(B)(ii). In the context of humanitarian parole under § 1182(d)(5)(A), plaintiffs may challenge the lawfulness of agency policies or procedures, even if the ultimate parole decision is discretionary.

> *iii. Section 1252(a)(2)(B)(ii) Does Not Preclude Judicial Review of Delay in Adjudication*

Plaintiffs allege that the new standards adopted by USCIS violate the APA because they are arbitrary and capricious (Count I), because they violate the humanitarian parole statute and USCIS's own policy manual (Count II), because they fail to comply with notice-and-comment requirements (Count III), and because they have generated unreasonable delay (Counts IV and V). Plaintiffs do not allege that the government is required to grant them parole, and thus they do not challenge any "Discretionary denial of relief" with the meaning of Section 1252(a)(2)(B). Thus, Plaintiffs' claims alleging unlawful delay cannot be barred by Section 1252. *See Doe v. Trump*, 288 F. Supp. 3d 1045, 1071–72 (W.D. Wash. 2017) ("Plaintiffs are challenging the failure to act on . . . applications" under the APA).

While the USCIS has discretion with respect to whether to grant or deny an application, it has a nondiscretionary duty to decide the application. 5 U.S.C. § 555(b) (compelling agencies "with due regard for the convenience and necessity of the parties or their representatives and within a reasonable time… [to] conclude a matter presented to it."). As a result, while the ultimate decision whether to grant a visa or parole is discretionary, immigration authorities have a non-discretionary duty to adjudicate applications. If an application is never adjudicated, as is the case here, there is no agency decision or action, which means the court is not precluded from asserting jurisdiction over the matter. *Iddir v. INS*, 301 F.3d 492, 498 (7th Cir. 2002) (stating that noncitizen plaintiffs "have a right to have their cases adjudicated"); *Patel v. Reno*, 134 F.3d 929, 933 (9th Cir. 1997) (finding that a consular officer had a duty to adjudicate visa application).

Delays in adjudications are not discretionary decisions within the meaning of § 1252(a)(2)(B)(ii). Numerous courts within the Ninth Circuit have also concluded that the pace at which USCIS processes applications is nondiscretionary and Section 1252(a)(2)(B)(ii) does not bar judicial review. *Ahmed v. Mayorkas*, 719 F. Supp 2d 1080 (N.D. Cal. 2009) (government has

non-discretionary duty to adjudicate, even if delay is due to USCIS's withholding adjudication because of suspicion that the applicant has provided material support for terrorism); *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1165 (N.D. Cal. 2007) ("[w]hile the ultimate decision to grant or deny an application . . . is unquestionably discretionary, there exists a non-discretionary duty to act on and process the application"); *Gianni v. Curda*, No. 2:07-cv-1478 GEB KJM, 2008 WL 479991, at 2 (E.D. Cal. Feb. 19, 2008) (same); *Liu v. Chertoff*, 2007 WL 2433337, at *3 (E.D. Cal. Aug. 22, 2007) (same).

Defendants' argument hinges on an overly broad interpretation of the term "action" in § 1252(a)(2)(B)(ii). They contend that the phrase "decision or action" in the statute renders unreviewable any discretionary act—or series of acts—within the parole adjudication process, including the pace at which USCIS processes applications. Mot. at 17. Defendants assert that USCIS need to issue RFEs or NOIDs and may adjudicate at any pace as parole is fully discretionary. *Id*. However, this interpretation disregards the critical limiting language of the statute itself. Section 1252(a)(2)(B)(ii) explicitly bars judicial review only of those "decision[s] or action[s] . . . the authority for which is specified . . . to be in [the Attorney General's or DHS's] discretion." The term "action" is not standalone; it is modified and constrained by the requirement that the discretion must be "specified" by statute. As the Supreme Court clarified in *Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010), "specified" does not encompass actions that are merely "assumed," "contemplated," "implied," or "anticipated." Here, the text of § 1182(d)(5)(A) does not "specify" that USCIS has discretion to decide whether or when to adjudicate humanitarian parole applications.

As Judge Alito noted in *Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 147 (3d Cir. 2004), marginally ambiguous statutory language is insufficient to "specify" that a particular action is

within the Attorney General's discretion for purposes of § 1252(a)(2)(B)(ii). Defendants' attempt to stretch the meaning of "action" to include the pace of adjudication is unsupported by the statutory text and contrary to established precedent. Accordingly, this Court retains jurisdiction over Plaintiffs' claim that USCIS has unreasonably delayed adjudication of their humanitarian parole applications. Defendants' motion to dismiss should be denied, as their interpretation of § 1252(a)(2)(B)(ii) is inconsistent with the statute's plain language and judicial precedent. In sum, Defendants have failed to discharge its heavy burden to demonstrate, clearly and convincingly, that Congress intended to bar this Court from even hearing Plaintiffs' claims.

**B. Title 5, Section 701(a)(2) Does Not Strip the Court of Jurisdiction Over Any of Plaintiffs' APA Claims.**

Defendants also assert that Plaintiffs' claims are unreviewable by virtue of being "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). *See* Mot. at 13-16. This argument is unavailing for several reasons.

First, the Supreme Court has repeatedly emphasized that the exception in § 701(a)(2) must be read narrowly to honor the presumption of judicial review under the Administrative Procedure Act (APA). *Regents,* 140 S. Ct. at 1905. Section 701(a)(2) only bars judicial review in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Lincoln v. Vigi*l, 508 U.S. 182, 191 (1993)); *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020) (noting that § 701(a)(2) applies only when the action is of a kind "traditionally regarded as committed to agency discretion").

Here, the humanitarian parole statute, 8 U.S.C. § 1182(d)(5)(A), USCIS's Policy Manual, and the agency's own standards provide meaningful criteria for judicial review. These sources bind

USCIS's discretion and establish a framework for evaluating whether the agency has acted arbitrarily or capriciously in administering the Afghanistan humanitarian parole program. As the Supreme Court held in *Regents*, when the government creates a program for conferring affirmative immigration relief, its actions—even those involving discretionary decisions—provide a focus for judicial review. 140 S. Ct. at 1905 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985)). In this case, Plaintiffs challenge USCIS's adoption of new standards that constrict the humanitarian parole program, replacing prior policies with more restrictive criteria. These actions are not "committed to agency discretion by law" under § 701(a)(2) because they involve the application of specific statutory and regulatory standards that provide a basis for judicial review. See *Regents*, 140 S. Ct. at 1905. Accordingly, Defendants' reliance on § 701(a)(2) is misplaced, and Plaintiffs' claims are subject to judicial review under the APA.

The same flaw undermines the government's response to Plaintiffs' allegations regarding the issuance (or non-issuance) of Requests for Evidence (RFEs) or Notices of Intent to Deny (NOIDs). *See* Mot. at 17-18. Plaintiffs are not challenging the merits of any specific RFE or NOID decision. Instead, they allege that the government's policy changes violate the statute and USCIS's Policy Manual, including its directives on RFEs and NOIDs. The Manual explicitly instructs adjudicators not to deny cases if the application, on its face, "does not establish eligibility for the benefit sought." Instead, adjudicators must issue RFEs or NOIDs unless "there is no legal basis for the benefit request and no possibility that additional information or explanation will establish a legal basis for approval." Compl. ¶ 94.

The defendants' argument that issuing an individual RFE or NOID is not a "final agency action" under § 704 of the APA also misses the mark. Mot. at 18. Plaintiffs are not challenging individual RFE or NOID decisions; they are challenging the new policy that

systematically withholds RFEs and NOIDs from Afghan applicants. Compl. ¶90. Courts have consistently held that the implementation of new policies—such as the one at issue here—constitutes final agency action subject to judicial review. See, *e.g., R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 376 (S.D.N.Y. 2019) (new USCIS policy leading to application denials was final agency action); *Aracely*, 319 F. Supp. 3d at 139 (unwritten policy rejecting parole requests based on improper factors was final agency action); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (unwritten DHS policy considering deterrence in custody determinations was final agency action).

Finally, Defendants' reliance on *Shihuan Cheng v. Baran*, No. CV 17-2001-RSWL-KSx, 2017 WL 3326451, at *7-8 (C.D. Cal. Aug. 3, 2017), is misplaced. That case addressed whether the issuance of an RFE in an individual case constituted final agency action—not whether a policy change, like the one challenged here, was reviewable. The distinction is critical. Plaintiffs are challenging a broad policy shift, not individual adjudicative decisions, and their claims are squarely within the scope of judicial review under the APA.

## C. Plaintiffs Have Standing to Pursue Their FOIA Claim, and the Claim Was Properly Brought Against the Correct Defendants

Defendants also seek dismissal of the Plaintiffs' FOIA claim for more information about the Afghanistan parole program. Mot. at 19-21. Plaintiffs defer to the Court's discretion on this matter but respectfully submit that Defendants, as the custodians of the record, are best positioned to file the record promptly to support their claims. Plaintiffs have no control over the record and rely on Defendants to produce it in accordance with their obligations under the Administrative Procedure Act (APA). Any further delay in filing the record would prejudice Plaintiffs and hinder the Court's ability to adjudicate this matter fairly and efficiently.

The Freedom of Information Act (FOIA) allows any person or entity to request records from federal agencies, and courts have consistently recognized that attorneys may act as agents for their clients in submitting FOIA requests. Here, Plaintiffs' counsel submitted the FOIA request on behalf of the Plaintiffs, even if their names were not explicitly listed on the request. *See* Exh. A. In *A Better Way for BPA*, the court held that the plaintiff organization had standing to sue because the FOIA request was made on its behalf, even though the request did not explicitly name the organization. 890 F.3d 1186, 1187 (9th Cir. 2018). The court emphasized that the key factor was whether the request was made on behalf of the plaintiff, not whether the plaintiff's name was explicitly listed. Here, the context of the FOIA request—submitted by Plaintiffs' counsel in connection with their representation of the Plaintiffs—makes it clear that the request was made on behalf of the Plaintiffs. The fact that the request discusses the counsel's role as a member of the media and an educational institution does not negate the fact that the request was also made on behalf of the Plaintiffs as attested to by the lead Plaintiff in his sworn statement. *See* Exh. A. Counsel can wear multiple hats, and the request's reference to Lal's other roles does not preclude it from also being made on behalf of the Plaintiffs.

Even if the FOIA request was submitted by counsel, the Plaintiffs are the real parties in interest because they are the ones seeking the information to support their claims. The purpose of FOIA is to ensure transparency and provide access to information, and denying standing to the Plaintiffs would undermine this purpose. Courts have allowed FOIA claims to proceed even when the request was made before formal litigation began, so long as the request was related to the claims in the lawsuit. See, *e.g., Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1120 (D.C. Cir. 2004) (timing of FOIA request does not affect standing if the request is related to the litigation).

While FOIA claims are typically brought against agencies, courts have allowed claims to proceed against agency heads in their official capacity. Naming the Secretary of Homeland Security (formerly Alejandro Mayorkas) and the Director of USCIS (formerly Ur Jaddou) in their official capacities is functionally equivalent to suing the agency itself. In *Drake v. Obama*, 664 F.3d 774, 785 (9th Cir. 2011), the court noted that FOIA claims must be brought against agencies, but it did not preclude naming agency heads in their official capacity. Naming agency heads in their official capacity is a common practice in FOIA litigation and does not warrant dismissal.

Even if the Defendants were not named in the technically correct manner, this is a curable defect that does not justify dismissal. Courts routinely allow plaintiffs to amend complaints to correct technical errors in naming defendants, especially when the correct agency is clearly identifiable from the context of the lawsuit as is the case here. Dismissal on this basis would elevate form over substance, contrary to the principles of fairness and access to justice underlying FOIA. See, *e.g.*, Fed. R. Civ. P. 15 (liberal amendment of pleadings to correct defects).

## III.    Plaintiffs Make Plausible Claims That Defendants' Policy Changes Violate The APA

The latter half of Defendants' motion seeks dismissal under Rule 12(b)(6)  for failure to state a claim because (1) Defendants argue that Plaintiffs' allegations of "new standards" are either based on existing regulations or fail to identify any actual policy changes, (2) even if changes were made, they fall within Defendants' discretion and are exempt from notice-and-comment requirements under the foreign affairs exception, and (3) Plaintiffs' claims of unreasonable delay are unsupported, as they have not demonstrated that the delay violates any legal standard. Mot. at 21-37.

### A.    Plaintiffs' APA Claims Are Plausible and Should Survive Rule 12(b)(6) Review, Especially in the Absence of an Administrative Record

This is an APA case. Plaintiffs assert four APA violations and two claims seeking relief—mandamus and declaratory—for those violations. Compl. ¶¶ 78-105. In response, Defendants have refused to provide Plaintiffs with information regarding the program, failed to produce an administrative record for the court, and now asks the court, in the absence of that record, to dismiss the Complaint under Rule 12(b)(6), based solely on its allegations. In considering a Rule 12(b)(6) motion to dismiss, courts must accept the allegations of the complaint as true and construe the pleading in the light most favorable to the plaintiff. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). Defendants ignore the fact that without an administrative record, dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory" neither of which is the case here.  See, *e.g., UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013); *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013) (the focal point of APA review is the administrative record); *Remmie v. Mabus*, 846 F.Supp. 2d 91, 95 (D.D.C. 2012) (denying a motion to dismiss an APA claim, reasoning "the administrative record has not yet been filed with the Court, making [any dismissal] determination rather difficult").

The Plaintiffs' complaint need only contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). This plausibility standard "is not akin to a probability requirement," id.; "weighing [of evidence] is inappropriate . . . at the dismissal stage." *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 785 (9th Cir. 1997). Without an administrative record to evaluate claims, the Complaint easily passes muster at this stage on the plausibility

standard. Plaintiffs have alleged several claims under the Administrative Procedure Act (APA), summarized below as follows:

        *i.   Changes In Parole Policies Are Arbitrary and Capricious in Violation of the APA*

Plaintiffs have plausibly alleged that Defendants implemented **new** standards for adjudicating humanitarian parole applications, which violate the APA's prohibition on arbitrary and capricious agency action under 5 U.S.C. § 706 (Count I). *See* Compl. at ¶¶ 78-86. This claim is supported by allegations that USCIS: (1) departed from prior policy and implemented new standards without even attempting to demonstrate that there are good reasons for the change; (2) failed to consider important aspects of the problem when it abruptly altered policy, including but not limited to the seriousness of the humanitarian crisis that followed the U.S. withdrawal from Afghanistan, and the reliance interests engendered by the government's assurances to Afghans left behind that the humanitarian parole process offered them a way to safety, *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983); and (3) systematically violated USCIS's own binding policies, which require parole adjudicators to ask applicants for additional evidence before issuing a denial unless there is "no possibility" that additional evidence could demonstrate eligibility for parole, USCIS Policy Memorandum, PM-602-0085 (June 3, 2013), USCIS Policy Alert, PA-2021-11 (June 9, 2021), and when denying a parole application, to provide "a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) . . . " USCIS Policy Manual, Vol. 1, Ch. 8, §D.

In support of this claim, the Plaintiffs allege facts indicating the peril of remaining in, or being returned to, Afghanistan; the manner in which the United States government held out the prospect of humanitarian parole to Afghans who were not evacuated in the airlift after the fall of

the Afghan government, and the significant steps that the Plaintiffs and other similarly-situated Afghans took in reliance on the government's assurances. Compl. at ¶¶ 3-4, 23-25, 42-43, 59-61. It also alleges that USCIS has suspended processing and failed to adjudicate Afghan parole applications, substituting case-by-case adjudications for a categorical rule refusing to adjudicate these applications, without informing the plaintiffs of this change. *Id.* ¶¶ 45-46, 49, 51, 53-54, 90

*ii. USCIS Has Failed to Comply with Existing Law and Agency Rules in Violation of the APA*

Plaintiffs allege that Defendants have failed to adjudicate Afghanistan humanitarian parole applications in accordance with existing law. 5 U.S.C. § 706 (Count II); *See* Compl. ¶¶ 87-90. The Complaint alleges that the new standards have the "purpose, and effect, of making it all but impossible for Afghan beneficiaries to be granted this benefit." Compl. ¶83; see also ¶¶ 48-49. The categorical nature of the new standards violates the legislative and administrative constraints on Defendants' discretion to grant or deny parole applications. Specifically, by causing its adjudicators to deny parole to Afghan applicants on a blanket basis, USCIS has breached:

**Statutory Obligation**: The requirement to make parole decisions "only on a case-by-case basis" under 8 U.S.C. § 1182(d)(5)(A).

**Regulatory Obligation**: The requirement to grant or deny parole "after review of the individual case" under 8 C.F.R. § 212.5(c).

**Policy Manual Obligation**: The requirement to act based on "all relevant, specific facts and circumstances in an individual case, both favorable and unfavorable to the exercise of discretion" under the USCIS Policy Manual, Vol. 1, Ch. 9, § B.3. *See* Compl. ¶¶ 89-90.

*iii. USCIS Has Failed to Comply with the APA's Notice-and-Comment Requirements*

Plaintiffs have also alleged that Defendants failed to comply with the APA's notice-and-comment requirements when implementing several new standards, which constitutes a violation

of the APA under 5 U.S.C. § 553 (Count III).  *See* Compl. at ¶¶ 91-95. This is supported by factual

allegations that the new standards are substantive (or "legislative") rules because they affect

individual and administrative rights, duties, and obligations, *Id.*, and that USCIS did not satisfy

the notice-and comment requirements before implementing the new standards for parole

applications from Afghan nationals. See, *e.g. Amalkalani v. McAleenan*, 527 F. Supp. 3d 205, 221

(E.D.N.Y. 2021) ("If a rule alters the rights or obligations of regulated parties . . . it is legislative

and therefore must be adopted via notice-and-comment rulemaking.").

### iv.  USCIS Has Unreasonably Delayed Adjudications of Afghan Parole Applications

Count IV of the Complaint alleges an APA claim for unreasonable delay and seeks a writ

of mandamus as relief. *See* Compl. at ¶¶ 96-102. The APA requires agencies to act with "due

regard for the convenience of the parties . . . and within a reasonable time," 5 U.S.C. §555(b), and

it authorizes the federal courts to "compel agency action unreasonably delayed." 5 U.S.C. §706(1).

The Complaint alleges that, since at least September 2021, the pace of adjudications of Afghan

parole applications has been unreasonably—indeed, unconscionably—slow. Before then, USCIS

had "acted with reasonable dispatch to address Afghan humanitarian parole applications." Compl.

¶ 40. Then things changed. For at least two months, from early September to November 2021,

USCIS stopped adjudicating Afghan parole applications altogether, even as it processed

applications from other countries. *Id*. at ¶ 54. When adjudications resumed, they did so at a snail's

pace. If the *TRAC* factors are relevant at this stage, they uniformly favor a finding of unreasonable

delay. There is an "economic" component to the delays because USCIS initially charged $575 per

application, and thus has collected over $20 million from the Afghan applicants whose cases

mostly remain unadjudicated. Compl. ¶¶ 3, 43-44, 59, 62. This is overwhelmingly a situation

"where human health and welfare are at stake." *Town of Wellesley*, 829 F.2d 275, 277 275 (1st Cir.

1987). The Complaint describes, in detail, the imminent risks to health and welfare faced by Afghan parole applicants in general, and the Plaintiffs in particular: the surveillance, the lurking presence of Taliban agents and informers, the hideouts, the limbo endured in third countries, the threats, the raids, the arrests, the physical attacks, and even the murders of relatives and neighbors. Compl. ¶¶ 3, 4, 25, 60, 66, 68-73, 75-76.

The "nature of the interests prejudiced by the delay," *Town of Wellesley*, 829 F.2d at 277, are as significant as life-and-death. The government, meanwhile, has no visible, legitimate interest in delay, and no "competing or higher priority," *id.*, than effecting a potentially safe passage for thousands of Afghans who faithfully served this country's interests. Indeed, with respect to the Afghans rescued by the American evacuation in the summer of 2021, the U.S. acted with alacrity, paroling more than 70,000 of the airlifted Afghans immediately upon their arrival in this country. Compl. ¶24. Thus, whether due to "improper" motives or bureaucratic inertia, Plaintiffs assert a viable claim that the government has improperly delayed action on their applications.

These four allegations under the APA are amply supported by factual allegations that must be accepted as true for present purposes, and sufficient to survive a motion to dismiss under Rule 12(b)(6) under the plausibility standard. Plaintiffs are not required to prove their claims at this stage; they need only present a plausible basis for relief, which they have done.

**B. Defendants' Mischaracterization of Plaintiffs' Allegations and Unlawful Policy Shift Violate Statutory and Humanitarian Parole Requirements**

*i. Defendants Cannot Hide Behind the Cloak of Necessity*

Plaintiffs do not merely allege a change in the "on-the-ground effects" caused by the fall of Kabul or the closure of the U.S. Embassy. Rather, they allege that Defendants implemented a new policy to categorically deny or administratively close parole applications for Afghans remaining in Afghanistan after the filing of many parole applications. Compl. ¶94. USCIS also

applied those changes to pending applications for Afghan humanitarian parole already on file without notifying applicants such as the Plaintiffs.

This policy change is distinct from the logistical challenges posed by the embassy closure. The embassy's suspension of operations may have created practical difficulties, but it does not explain or justify Defendants' decision to adopt a blanket policy of denying or closing applications for Afghans in Afghanistan. Plaintiffs' allegations are about a deliberate policy choice, not an unavoidable consequence of external events, especially given that similar closures of U.S. embassies in countries such as Ukraine did not deter the United States from continuing the parole process for Ukrainians. Comp. ¶63. In fact, the United States announced parole programs for Venezuelans in October 2022 and Haitians, Cubans, and Nicaraguans in January 2023, and except for Nicaragua, none of these countries have operational U.S. embassies. Despite this operational difficulty, as of the end of October 2024 when this complaint was filed, 110,240 Cubans, 211,010 Haitians, 93,070 Nicaraguans, and 117,310 Venezuelans, received travel authorizations online, and made arrangements to fly to a U.S. airport, and were granted parole by a Customs and Border Protection (CBP) officer upon their arrival. *See* U.S. Customs & Border Prot., CBP Releases October 2024 Monthly Update (Nov. 11, 2024), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-october-2024-monthly-update.

As such, while the closure of the U.S. Embassy in Kabul may have disrupted certain consular services, it does not necessitate the categorical denial or administrative closure of parole applications because the United States continued to process and grant thousands of parole applications for several years to persons residing in countries without U.S. consular services. Defendants could have easily implemented alternative measures to process applications, such as allowing applications to be processed through third-country embassies or consulates or providing

remote or virtual processing options or issuing Requests for Evidence (RFEs) or Notices of Intent to Deny (NOIDs) to address missing documentation.

It took none of these steps for the Afghanistan parole program. Instead, Defendants chose to adopt a policy that effectively bars Afghans in Afghanistan from accessing the parole process altogether. This goes beyond addressing logistical challenges and constitutes a new standard that violates the statutory and regulatory framework governing humanitarian parole. As such, this shift in policy was not the only course of action available to USCIS.

The humanitarian parole statute, 8 U.S.C. § 1182(d)(5)(A), requires that parole decisions be made on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit." Courts have consistently held that agency policies must comply with statutory mandates, even in the face of practical challenges. See, *e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,* 140 S. Ct. 1891, 1905 (2020) (agency policies must operate within statutory frameworks). By categorically denying or closing applications for Afghans in Afghanistan, Defendants have abandoned this case-by-case approach and imposed a blanket policy that conflicts with the statute.

*ii. USCIS's Policy Change Violates Statutory Parole Requirements and Case-by-Case Adjudication Mandate*

Plaintiffs maintain that USCIS's alleged instruction to adjudicators—that parole applications for individuals who have left Afghanistan "could be approved only in extreme cases" and that such individuals "would no longer meet the urgent humanitarian reason prong of 8 U.S.C. § 1182(d)(5)(A) unless they faced imminent harm in Afghanistan or an imminent risk of being returned to Afghanistan"—constitutes a de facto policy change that violates the statutory framework and USCIS's own case-by-case adjudication mandate. Compl. ¶¶ 49, 94. Contrary to Defendants' assertions, this shift is not merely a "commitment to comply with parole requirements" but rather an

unlawful departure from the individualized assessment required by statute and precedent.

While Congress has indeed limited parole to cases involving "urgent humanitarian reasons" or "significant public benefit," 8 U.S.C. § 1182(d)(5)(A), it did not authorize USCIS to impose blanket restrictions or presumptive denials based on an applicant's location outside their home country. The statute does not categorically exclude individuals who have fled to third countries from qualifying for parole, nor does it require that they demonstrate "imminent harm" or risk of return to their home country as a precondition for eligibility. By imposing such requirements, USCIS has effectively created a new standard that narrows the statutory criteria and undermines the discretionary, case-by-case adjudication process mandated by law.

Defendants' argument that parole applications may lose their "urgency" once an applicant reaches a third country is both speculative and inconsistent with the realities faced by Afghan parole applicants. Many Afghans who have fled to third countries remain in precarious and unstable conditions, often without legal status, access to basic necessities, or protection from refoulement. The suggestion that these individuals can simply "await routine refugee processing or normal visa processing procedures" ignores the significant delays, backlogs, and barriers inherent in those systems, as well as the urgent humanitarian needs that persist even after leaving Afghanistan. Parole exists precisely to address such exceptional circumstances, and USCIS's alleged policy effectively nullifies this critical lifeline for vulnerable individuals.

Moreover, Defendants' claim that USCIS has continued a case-by-case adjudication mandate for all parole applications is contradicted by the allegations in the Complaint, which suggest that USCIS has adopted a presumptive approach to denying or withholding adjudication of parole applications from Afghans outside Afghanistan. This practice violates the agency's obligation to consider the "totality of the circumstances" in each case and amounts to an arbitrary

and capricious policy shift. *See* 5 U.S.C. § 706(2)(A) (requiring agency action to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Plaintiffs have adequately alleged that USCIS's actions are inconsistent with the statutory framework and its own policies, and Defendant has failed to justify this departure from lawful adjudication practices.

In sum, Plaintiffs have demonstrated that USCIS's alleged policy change is not only a "new standard" but also an unlawful one that contravenes the statutory parole requirements, undermines the agency's discretion, and disregards the urgent humanitarian needs of Afghan parole applicants. Defendants' attempt to reframe this policy as mere compliance with the statute is unpersuasive and does not address the core allegations of arbitrariness and unlawfulness.

### iii. *USCIS's Refusal to Issue RFEs and NOIDs for Afghan Applicants Violates Policy and Fair Adjudication Practices*

Plaintiffs maintain that USCIS's alleged refusal to issue Requests for Evidence (RFEs) or Notices of Intent to Deny (NOIDs) for Afghan parole applicants, even when additional information could potentially yield an approval, constitutes an unlawful departure from its established policies and practices. Compl. ¶94. While Defendant correctly notes that the issuance of RFEs and NOIDs is generally discretionary, this discretion is not unfettered and must be exercised in a manner consistent with statutory requirements, due process, and the agency's own policies. USCIS's alleged failure to adhere to its written policy of seeking additional information when eligibility is in doubt—particularly in the context of Afghan parole applicants—reflects an arbitrary and capricious shift in adjudication practices that undermines the integrity of the parole process.

Defendants' assertion that "no changes to the RFE/NOID rules" were made post-August 31, 2021, misses the point. Plaintiffs do not allege a formal change to the rules but rather a de facto policy shift in how those rules are applied to Afghan applicants. The USCIS Policy Manual

explicitly encourages officers to issue RFEs or NOIDs "when the evidence submitted with the application or petition does not establish eligibility but there is a possibility that additional evidence might do so." USCIS Policy Manual, Vol. 1, Part E, Ch. 6. This guidance reflects a longstanding practice of ensuring that applicants have a meaningful opportunity to substantiate their claims before a final decision is made. By systematically withholding RFEs and NOIDs for Afghan applicants, USCIS has effectively nullified this opportunity, creating a presumption of denial that contradicts both the Policy Manual's spirit and the agency's obligation to adjudicate cases fairly and on their individual merits.

Moreover, Defendants' argument that DHS is not required to "continuously solicit evidence" until parole is granted mischaracterizes Plaintiffs' allegations. Plaintiffs do not contend that USCIS must endlessly seek evidence but rather that it must adhere to its own policies and provide applicants with a fair opportunity to address deficiencies in their applications. The refusal to issue RFEs or NOIDs in cases where additional evidence could establish eligibility is particularly egregious in the context of Afghan parole applicants, many of whom face significant challenges in gathering and submitting documentation due to their displacement, lack of access to resources, and the chaotic conditions under which they fled Afghanistan. USCIS's alleged policy shift exacerbates these challenges, effectively denying applicants the chance to present their cases fully and fairly.

Defendants' reliance on 8 U.S.C. § 1182(d)(5)(A) is similarly unavailing. While the statute does not explicitly require the issuance of RFEs or NOIDs, it does require USCIS to exercise its parole authority in a manner consistent with the statutory framework and its own policies. By systematically denying Afghan applicants the opportunity to provide additional evidence— contrary to the Policy Manual's guidance and established practices—USCIS has effectively

created a new, unwritten standard that undermines the individualized assessment required by law. This practice is arbitrary, capricious, and inconsistent with the agency's statutory and regulatory obligations. *See* 5 U.S.C. § 706(2)(A).

In sum, Plaintiffs have adequately alleged that USCIS's refusal to issue RFEs or NOIDs for Afghan parole applicants constitutes an unlawful departure from its own policies and practices, as well as a violation of the statutory framework governing parole. Defendants' attempt to justify this shift as a mere exercise of discretion is unpersuasive and fails to address the core allegations of arbitrariness and unfairness. Plaintiffs respectfully request that the Court reject Defendants' arguments and hold USCIS accountable for its unlawful and discriminatory adjudication practices.

### iv. The Foreign Affairs Exception Does Not Apply in This Case

Next, Defendants invoke the foreign affairs exception to the APA's notice-and-comment requirement under 5 U.S.C. § 553(a)(1). While the foreign affairs exception exempts certain agency actions from notice-and-comment requirements when they involve "a military or foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), this exception is narrowly construed and does not apply to agency actions that are primarily domestic in nature, even if they have some tangential connection to foreign affairs. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018) (a "general nexus between immigration and foreign affairs" is not sufficient to trigger the APA's foreign affairs exception). The Ninth Circuit explained in this case that "[t]he foreign affairs exception would become distended if applied to [an immigration enforcement agency's] actions generally, even though immigration matters typically implicate foreign affairs." *See East Bay Sanctuary Covenant* at 932 F.3d at 776 (citing *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).

Defendants have the burden of showing that engaging in notice and comment would have

provoked "definitely undesirable international consequences" by explaining the detrimental effects of compliance with the APA's requirements." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021). Defendants have not fulfilled their burden. Nothing in the motion to dismiss explains— much less demonstrates, with evidence—how complying with the notice-and-comment procedures, and leaving the "old" standards for parole in the interim, could have provoked negative international consequences. The need for prompt implementation, and the potential consequences of delay, might have been demonstrable if the new standards had been intended to speed up the pace of adjudications, and to ensure that more Afghan applicants would obtain relief through the parole mechanism. But the new standards had exactly the opposite purpose and effect.

Further, adjudicating humanitarian parole applications is fundamentally a matter of domestic immigration adjudication. Parole determinations are governed by 8 U.S.C. § 1182(d)(5)(A), which authorizes USCIS to exercise discretion in admitting individuals into the United States for urgent humanitarian reasons or significant public benefit. This discretionary authority is squarely within the realm of immigration law, not foreign affairs. The fact that the applicants at issue are Afghans does not transform USCIS's adjudication of their parole applications into a "quintessential foreign affairs function." *East Bay Sanctuary Covenant* at 932 F.3d at 776 (noting that the foreign affairs exception applies only where the international consequences of an agency action are "obvious" or where notice-and-comment would provoke "definitely undesirable international consequences").

Defendants' reliance on the chaotic and fast-moving nature of the U.S. withdrawal from Afghanistan is similarly unavailing. While the withdrawal undoubtedly involved foreign affairs and military functions, USCIS's subsequent adjudication of parole applications is a separate and

distinct process that does not require the same rapid response or implicate the same foreign policy concerns. The alleged policy changes at issue here were not made in the immediate aftermath of the withdrawal but rather in the months that followed, when USCIS had ample opportunity to engage in notice-and-comment rulemaking if it wished to adopt new standards for parole adjudication. *See id*. at 775 (noting that the foreign affairs exception is not a blanket exemption for all agency actions taken in the context of a foreign crisis).

Moreover, Defendants' argument that notice-and-comment rulemaking would have "hindered" the Executive's ability to respond to the crisis is speculative and unsupported by the record. The alleged policy changes do not involve the suspension of consular services or other actions directly tied to the withdrawal from Afghanistan. Rather, they pertain to USCIS's internal adjudication processes, which are governed by domestic immigration law and policy. The foreign affairs exception cannot be used as a pretext to evade the APA's procedural requirements for agency actions that are primarily domestic in nature. *See Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (cautioning against overbroad application of the foreign affairs exception).

Finally, Defendants' reliance on *Roe v. Biden*, 2023 WL 346637 (D.D.C. Jan. 20, 2023), is misplaced. In *Roe*, the court held that the foreign affairs exception applied to the closure of the U.S. Embassy in Kabul and the suspension of consular services, which were directly tied to the military withdrawal and involved "a matter of great international consequence." *Id*. at *17. Here, by contrast, the alleged policy changes relate to USCIS's adjudication of parole applications, a process that is distinct from the embassy closure and does not implicate the same foreign policy concerns. The foreign affairs exception does not extend to agency actions that are merely incidental to a foreign crisis.

1    Consequently, USCIS's adoption of a "new standard" for adjudicating Afghan parole
2    applications is not exempt from the APA's notice-and-comment requirements under the foreign
3    affairs exception. Plaintiffs respectfully request that the Court reject Defendants' argument and
4    hold USCIS accountable for its failure to comply with the APA's procedural safeguards.

5    *v.   USCIS's Deterrence Policy Contradicts Statutory Parole Requirements*

6    Defendants' attempt to justify USCIS's alleged adoption of "new standards" aimed at
7    increasing denials and deterring applicants is both legally and factually flawed. Plaintiffs have
8    adequately alleged that USCIS's actions were driven by impermissible considerations, including
9    the desire to reduce the number of approvals and discourage applications, rather than by a reasoned
10    application of the statutory criteria for parole under 8 U.S.C. § 1182(d)(5)(A). Such motivations,
11    if proven, would render the agency's actions arbitrary, capricious, and contrary to law under the
12    Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(A).

13    While Defendants correctly note that courts generally defer to agency decision-making if
14    it is reasonable, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009), this deference
15    is not unlimited. Agency actions must still be grounded in a rational connection to the statutory
16    purpose and supported by reasoned decision-making. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463
17    U.S. at 43. Here, Plaintiffs allege that USCIS's alleged policy shift was motivated not by a
18    legitimate application of the statutory criteria for parole but by an impermissible desire to reduce
19    the number of approvals and deter applicants. Compl. ¶85. Such motivations are inconsistent with
20    the humanitarian purpose of the parole statute and undermine the agency's obligation to exercise
21    its discretion in a manner consistent with the law.

22    Defendants' argument that considerations such as deterring applicants and increasing
23    denials are not "impermissible" is unpersuasive. The parole statute, 8 U.S.C. § 1182(d)(5)(A),

37

authorizes parole for individuals who demonstrate urgent humanitarian reasons or significant public benefit. It does not authorize USCIS to adopt policies designed to systematically deny parole to eligible applicants or to discourage individuals from seeking humanitarian relief. By allegedly prioritizing administrative convenience and deterrence over the statutory purpose of parole, USCIS has acted in a manner that is arbitrary, capricious, and contrary to law. *See State Farm*, 463 U.S. at 43 (holding that agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency").

Moreover, Defendants' reliance on *FCC v. Fox Television Stations* is misplaced. In that case, the Supreme Court upheld an agency's policy change because it was supported by a reasoned explanation and a rational connection to the statutory purpose. *Fox Television Stations,* 556 U.S. at 515. Here, by contrast, Plaintiffs allege that USCIS's alleged policy shift was motivated by impermissible considerations and lacked any reasoned connection to the statutory criteria for parole. Such actions cannot be justified under the APA, even under the deferential standard of review set forth in *Fox Television Stations*.

Finally, Defendants' suggestion that parole is not meant to serve as a broad humanitarian remedy ignores the plain language of the statute and its legislative history. While parole is discretionary, it is explicitly intended to address urgent humanitarian needs and significant public benefits. 8 U.S.C. § 1182(d)(5)(A). By allegedly adopting a policy designed to systematically deny parole to eligible applicants, USCIS has undermined this statutory purpose and violated its obligation to exercise its discretion in a manner consistent with the law. Plaintiffs respectfully request that the Court reject Defendants' arguments and hold USCIS accountable for its unlawful actions.

1

### C. *TRAC* Factors Favor Plaintiffs

Defendants' argument that the delay in adjudicating Plaintiffs' parole applications is not unreasonable under the APA fails to account for the extraordinary circumstances faced by Afghan applicants and the statutory purpose of humanitarian parole. While Defendant correctly outlines the *TRAC* factors for assessing unreasonable delay, *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*"), their application of these factors is flawed and ignores the urgent humanitarian needs at stake. *See also Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (adopting the *TRAC* factors test).

### i.    *The Delay Is Unreasonable Under the "Rule of Reason"*

"The most important *TRAC* factor is the first factor, the 'rule of reason,' though it, like the others, is not itself determinative." *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017). "This factor requires that the time it takes for the agency to act is governed by a rule of reason." *Su v. Mayorkas*, 698 F.Supp.3d 1168, 1177 (N.D. Cal. 2023). Here, Defendants' claim that the delay is reasonable because Plaintiffs' applications have not been pending for more than four years is unpersuasive. The "rule of reason" must be evaluated in light of the humanitarian purpose of parole and the dire circumstances faced by Afghan applicants. Compl. ¶¶ 66–77. Many Plaintiffs have been waiting for years while living in precarious conditions, often without legal status, access to basic necessities, or protection from refoulement. The fact that other cases have involved longer delays, such as in *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003), does not justify the delay here, as those cases did not involve the same urgent humanitarian concerns. The delay in adjudicating Plaintiffs' applications is particularly egregious given the life-threatening risks they face and the explicit statutory mandate to address urgent humanitarian needs. 8 U.S.C. § 1182(d)(5)(A). Furthermore, Defendants have unreasonably placed

39

Afghanistan humanitarian parole applications on hold, while processing parole applications filed much later, following no apparent order in adjudications.

### ii.  *Congressional Intent Supports Expediting Applications*

"The second *TRAC* factor considers whether Congress has provided an indication of the speed with which it expects an agency to act." While 8 U.S.C. § 1182(d)(5)(A) does not specify a timeframe for adjudication, the statute's emphasis on "urgent humanitarian reasons" and "significant public benefit" underscores the need for timely action. The humanitarian parole program is designed to address emergencies, not to languish in bureaucratic delays. Defendants' argument that the absence of a statutory deadline justifies indefinite delays turns the statute's purpose on its head. Courts have consistently held that agencies must act within a reasonable time, particularly when human welfare is at stake. See, *e.g., In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (noting that agencies must act "within a reasonable time" even in the absence of a statutory deadline); *Razaq v. Poulos,* 2007 WL 61884 at *4 (N.D.Cal.2007) (absence of a specified deadline does not change USCIS' obligation to act)

### iii.  *Human Health and Welfare Factor Favors Plaintiffs*

The third *TRAC* factor weighs heavily in Plaintiffs' favor. The delay in adjudicating their parole applications has severe consequences for their safety and well-being. Many Plaintiffs face imminent harm, including persecution, violence, and lack of access to basic necessities. Compl. ¶¶ 66–77. The humanitarian purpose of parole is precisely to address such urgent needs, and Defendants' failure to act in a timely manner undermines this statutory mandate. *See TRAC*, 750 F.2d at 80 (noting that delays are "less tolerable when human health and welfare are at stake").

### iv.  *Expediting Adjudication Would Not Disrupt Higher-Priority Agency Activities*

Defendants' claim that expediting Plaintiffs' applications would disrupt higher-priority

agency activities is speculative and unsupported by the record. The adjudication of humanitarian parole applications is a core function of USCIS, and the agency has a duty to allocate resources to fulfill its statutory obligations. Moreover, Plaintiffs are not asking to be moved to the "front of the line" but rather seeking timely adjudication of their applications, which have been pending for years. *See Mashpee*, 336 F.3d at 1100 (noting that courts may intervene when delays are unreasonable, even if other applicants are affected).

### v. Plaintiffs Are Prejudiced by the Delay

The fifth *TRAC* factor also weighs in Plaintiffs' favor. The delay in adjudicating their applications has caused significant harm, including prolonged exposure to life-threatening conditions and the inability to reunite with family members in the United States. Compl. ¶¶ 3, 66–77. Defendants' argument that Plaintiffs have not suffered a legal injury because they are not entitled to parole ignores the fact that they are entitled to a timely adjudication of their applications. *See* 5 U.S.C. § 555(b) (requiring agencies to conclude matters "within a reasonable time").

### vi. The Delay Is Due to Agency Inefficiency, Not Unprecedented Surge

Finally, Defendants' claim that the delay is due to an "unprecedented surge" in applications is unpersuasive. While the number of parole applications has increased, the agency's failure to allocate sufficient resources to address this surge reflects internal inefficiency, not an unavoidable consequence of external events. Compl. ¶¶ 32, 57. As of December 2024, Defendants were able to process and parole over about 531,690 Cubans, Haitians, Nicaraguans, and Venezuelans into the United States within a couple of years who applied for entry much after the initiation of the Afghan

humanitarian parole policy so the delays are not about a surge in applications.[1] In sum, the *TRAC* factors weigh heavily in Plaintiffs' favor, and the delay in adjudicating their parole applications is unreasonable under the APA. Plaintiffs respectfully request that the Court reject Defendants' arguments and compel USCIS to adjudicate their applications in a timely manner.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

/s/ Prerna P. Lal*

Lal Legal APLC

2001 Addison St, STE 300

Berkeley CA 94704

Phone: (800) 552-5616

prerna@lallegal.com

Attorney for Plaintiffs

---

[1] *See* U.S. Customs & Border Prot., CBP Releases December 2024 Monthly Update (Jan. 14, 2025) https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXH. A**

### SWORN STATEMENT OF PLAINTIFF
### MOHAMMAD ANOOSH AZIZI

I declare under penalty of perjury that the foregoing statement

1. I am a U.S. citizen and one of the plaintiffs in 2:24-cv-02959-JDP currently pending in the Eastern District of California.

2. I served as a linguist for the United States military in Afghanistan. Due to my affiliation with the U.S. military, the Taliban threatened me and then tried to kidnap and kill me. Even after I escaped to the United States, the Taliban kept hounding my family in Afghanistan, calling them infidels and traitors.

3. In 2021, due to Operation Allies Welcome, I was able to get most of my close family members to the United States, except for my brother, Mohammad Walid Azizi, my newborn nephew and sister-in-law. I filed for humanitarian parole for my brother and other relatives in 2021. I was also going to apply for humanitarian parole for my nephew but he perished due to the Taliban. This loss was so devastating for all of us.

4. I have been working with Attorney Lal for over three years to secure asylum and lawful permanent resident status for my parents and other siblings in the United States. The situation in Afghanistan seemed to be deteriorating and my brother had to be on the move constantly to be safe. I approached Attorney Lal in December 2023 about the delays with the parole applications I had filed, and to file a mandamus for us who were still awaiting decisions on Humanitarian parole. I had about 10-12 people who were interested in filing a lawsuit at the time. Attorney Lal also suggested that we should request records from the government that can bolster or support our claims and get to the bottom of what was happening with the program. As such, they filed a FOIA request on our behalf with USCIS sometime in April 2024.

5. It was our hope that the records we obtained would shed new light on the program, what had changed since the program was announced, and why it was taking so long to process our applications.

6. Alas, we are still awaiting production of these records from USCIS more than 9 months later. Unfortunately this meant that we had to put together our complaint based on slightly older records available in the public stream in 2023 https://www.americanimmigrationcouncil.org/news/advocates-release-foia-data-seek-transparency-thousands-afghans-seeking-humanitarian-parole, which may or may not be reliable.

7. Moving forward, we reiterate our demand for the government to immediately produce updated records and data regarding the Afghanistan humanitarian parole program. Transparency is not just a request—it is an obligation. We need to understand the root

cause of these inexcusable delays, which we believe stem from a bait-and-switch tactic and/or arbitrary policy changes after filing these applications.

8. It is unacceptable that the government has collected over $20 million from desperate families like mine, who are fighting to secure the safety of their loved ones while adjudicating only a fraction of these cases. They have taken our money and are holding our lives hostage. We deserve answers, accountability, and action. The government must explain why this program has been effectively abandoned and provide a clear, immediate path forward for the countless families left in limbo. Our lives and futures depend on it.

9. I thank you for your time and kind consideration of this matter. Your attention to this issue is greatly appreciated.


Sincerely,

02/07/25

Mohammad Anoosh Azizi

## <u>DECLARATION OF SERVICE</u>

I hereby certify that on February 12, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve a copy of this document upon all counsel of record.

DATED this February 12, 2025, at Berkeley, California

<u>/s/ Prerna P. Lal*</u>

Lal Legal APLC

2001 Addison St, STE 300

Berkeley CA 94704

Phone: (800) 552-5616

prerna@lallegal.com

Attorney for Plaintiffs