UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

MOHAMMAD ANOOSH AZIZI, *et al.*,
Plaintiffs,
v.
MARKWAYNE MULLIN, *et al.*,
Defendants.

Case No. 2:24-cv-2959-JDP

ORDER

Plaintiffs, a group of eight Afghan nationals and three U.S. citizen family members, bring this action against defendants Kristi Noem, in her official capacity as Secretary of Homeland Security, and Jennifer Higgins, in her official capacity as Director of Citizenship and Immigration Services. Those individuals are no longer in those roles; the appropriate defendants are now Markwayne Mullin and Joseph Edlow. I will direct the Clerk of Court to substitute their names on the docket. Plaintiffs challenge the adjudicative standards for Afghan humanitarian parole applications and assert that the government has unreasonably delayed its review of their applications. The parties have filed cross motions for summary judgment. For the reasons stated below, plaintiffs' motion will be denied, and defendants' motion will be granted.

**Background**

Plaintiffs challenge the government's policies regarding Afghan humanitarian parole applications. The Immigration and Nationality Act ("INA") vests the Secretary of Homeland

Security with discretion to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States[.]" 8 U.S.C. § 1182(d)(5)(A). A parolee is not considered admitted for immigration purposes, and once the Secretary of Homeland Security determines that "purposes of such parole . . . have been served[,]" the parolee "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id*.

U.S. Citizenship and Immigration Services ("USCIS" or "the Agency") provides in a 2017 manual that "[p]arole decisions are made on a case-by-case basis, taking into account all factors and considering the totality of the circumstances." U.S.C.I.S. 65.[1] This manual further provides that "[r]easons parole is requested include, but are not limited to: obtaining medical treatment, for family unification or other family-related reasons, to attend legal proceedings, or in extremely limited circumstances, for protection purposes." U.S.C.I.S. 42.

The Agency's policies reflect that "[g]enerally, parole is not authorized for protection reasons" and "[s]hould not be used to bypass refugee processing." U.S.C.I.S. 324; *see* U.S.C.I.S. 31 ("Parole is only rarely granted [for protection reasons], even if urgent humanitarian reasons have been established.") (emphasis omitted). Some estimates indicate that the Agency has typically approved around 13% of applications claiming protection-based needs. U.S.C.I.S. 1214. In determining whether parole should be granted for protection, the Agency considers whether parole is "likely to be temporary" and will only grant parole if the beneficiary can "get to another location for processing if [there is] no U.S. Embassy presence in the country" of origin. U.S.C.I.S. 326. As of September 2021, the Agency "only had three permanent adjudication officers on board to process humanitarian parole cases, as the office received fewer than 2,000 such requests per fiscal year, on average." U.S.C.I.S. 2576.

---

[1] The court has eliminated leading zeros in its citations to the administrative record.

Around August 14, 2021, the Taliban began taking over Afghanistan, and the United States responded by closing its embassy and evacuating U.S. citizens and staff from the country. *See* U.S.C.I.S. 450. However, some embassy staff members remained in Afghanistan to process parole applications.[2] U.S.C.I.S. 480. The Agency recognized that "[i]t is a crucial life and death situation for the parole beneficiaries in Afghanistan, and we need to complete these cases as soon as possible." U.S.C.I.S. 449. The Agency conditionally approved parole applications so that beneficiaries could board evacuation flights, with the approval being contingent upon completion of consular processing outside of Afghanistan. *See* U.S.C.I.S. 489, 596. To assist with these applications, the Agency temporarily surged staffing. U.S.C.I.S. 522. The Department of State also assisted in contacting beneficiaries for consular processing and evacuation assistance. U.S.C.I.S. 522. By the end of August 2021, the U.S. government was no longer conducting operations inside Afghanistan, and evacuation flights had stopped. *See* U.S.C.I.S. 700, 944. During the evacuation, the Agency approved 104 out of 108 parole applications, resulting in a 96% approval rate.[3] U.S.C.I.S. 596.

On September 1, 2021, the Agency determined that it would "no longer expedite all Afghan parole requests," since evacuation flights had ended. U.S.C.I.S. 590. The Agency also encountered problems with these applications, including that there were no consular operations in Afghanistan, most requests were protection-related, and it was difficult for applicants to satisfy medical requirements, such as TB screening. U.S.C.I.S. 640, 2233. Accordingly, on September 7, 2021, the Agency temporarily paused the issuance of decisions on Afghan parole applications while it assessed "whether any additional guidance needs to be provided to adjudicators."[4] U.S.C.I.S. 630.

---

[2] At that time, the fee for a humanitarian parole application was $575. U.S.C.I.S. 2450.

[3] The Agency cautioned at that time that "[t]hese stats require explanation and may be misleading because we were focusing on just **getting the approvals** out in hopes of the beneficiaries getting on an evacuation flight." U.S.C.I.S. 596 (emphasis in original).

[4] It appears that the Agency received Congressional inquiries as to the status of Afghan parole applications at this time, and staffers internally drafted a "general response" to avoid "sharing that all Afghan [humanitarian parole] requests [were] currently on hold." U.S.C.I.S. 665.

The number of applications was also unusually high. The Agency observed in October 2021 that it "normally get[s] 1,500-2,000 parole requests per year from the entire world" and had received "over 16,000 [requests] just from Afghans in the last couple months, most inside Afghanistan." U.S.C.I.S. 825. By November 2021, the Agency had resumed processing applications and "decided to prioritize those outside Afghanistan because they clearly have a much more realistic path to the U.S." U.S.C.I.S. 954. The Agency also began "to deny cases for those who are ineligible, including the protection cases that do not meet our parole requirements who should seek protection though [sic] existing third country protection and refugee processing channels." U.S.C.I.S. 910.

On November 5, 2021, the Agency issued Parole Requests for Afghan Nationals Interim Policies and Procedures ("the Policy"). U.S.C.I.S. 1075. The Policy provided that "each application must be evaluated on its own merits taking into account all the factors unique to the specific parole request and considering the totality of the circumstances." *Id*. Regarding protection-based requests, the Policy recognized that this basis was traditionally uncommon for parole, and it provided that "USCIS generally approves requests based on protection needs only if there is credible, third-party evidence naming the beneficiary that shows the beneficiary is targeted and at imminent risk of severe harm." U.S.C.I.S. 1076.

The Policy stated that beneficiaries inside Afghanistan "will be required to leave Afghanistan in order to complete processing of their parole request." U.S.C.I.S. 1077. The Policy further provided that:

> It may be difficult to assess eligibility based purely on protection needs while an individual is still in Afghanistan, as the adjudicator will not know when or how the beneficiary will leave Afghanistan, where the beneficiary will be once outside of Afghanistan, or the protection that may be available to the beneficiary in that location. Therefore, for Afghan nationals in Afghanistan, parole requests based on protection needs, without other factors, such as the beneficiary's falling into one of the categories of Afghan nationals prioritized by the interagency, family reunification, or urgent medical needs, generally will be denied. Such parole beneficiaries should be given denial notices informing them that 1) their parole applications cannot be approved at this time and that, should they get to a third country, they should contact the United Nations High Commissioner for Refugees (UNHCR) for protection and consideration of refugee resettlement in the United States through

> the U.S. Refugee Admissions Program; and 2) should they be at imminent risk of severe harm in that third country or forced return to Afghanistan, they should contact USCIS with information on whether they have contacted UNHCR for protection assistance and include any third-party credible evidence of their risk in that third country.

*Id*.

Further, the Policy dictated that beneficiaries "initially found eligible for parole" were to be issued a notice that their application had been suspended unless and until they informed the Agency that they were able to report to a U.S. embassy or consulate. *Id*. If a beneficiary indicated that they could report to a U.S. embassy or consulate to continue processing, the Agency would issue a conditional approval notice after, *inter alia*, the agency verified that the beneficiary remained eligible for parole. U.S.C.I.S. 1083.

By February 21, 2022, over 30,000 parole requests from Afghans remained pending, representing over 70% of all pending requests from around the world. U.S.C.I.S. 1255. The Agency remarked that, as of March 20, 2022, it had "received an average of 1,575 new parole request per week—an amount similar to the annual number of receipts for some years." U.S.C.I.S. 1262. The Agency observed that it had "capacity to complete approximately 6,400 parole cases a year[,]" but even with "approximately 100 detailees assisting with the effort, the backlog continues to grow." *Id*.

On April 28, 2022, the Agency provided updated guidance on protection-based parole requests. U.S.C.I.S. 1480. The Agency emphasized that parole "[s]hould not be used to bypass refugee processing or be inconsistent with U.S. policy regarding refugee admissions" and that "[g]enerally, parole is authorized only in limited circumstances for protection reasons." U.S.C.I.S. 1487. The updated guidance also reduced the evidentiary burden on beneficiaries, providing that adjudicators needed to find evidence of "serious, imminent harm to the beneficiary" by a preponderance of the evidence. *See* U.S.C.I.S. 1488, 1585. It also provided that serious, imminent harm could be based on "individual threats" or "membership in a 'targeted group[.]'" U.S.C.I.S. 1491.

Applications continued to pour in from Afghans seeking parole. By February 2023, the Agency estimated that it still received approximately 1,200 such applications per month. U.S.C.I.S. 1755. Throughout 2023 and 2024, the Agency increased its rate of completing these applications and hired additional staff to assist in the "large parole backlog." *See* U.S.C.I.S. 2059, 1724, 2007. By October 2024—when this action began—the Agency had seen a 51% increase in its annual completion of Afghan parole cases. U.S.C.I.S. 2195. Nonetheless, the backlog has persisted. Between August 1, 2021 and January 23, 2024, the Agency received 53,278 parole applications for Afghans, and it adjudicated 17,923 of those, including "conditional approvals, denials, and continued processing cases[,]" leaving 34,288 cases pending.[5] U.S.C.I.S. 2502.

Plaintiffs Mohammad Walid Azizi, Nargis Ghafoori, Azizalrahman Rahmani, Beheshta Rahmani, Husna Rahmani, and Shadab Shahab submitted their parole applications in October 2021, while plaintiffs Shahram Mohammad Azizi and Asayesh Azizi submitted their applications in December 2023. *See* Each Individual Record at 1.[6]

**Procedural History**

Plaintiffs initiated this action in October 2024, alleging that defendants violated the Administrative Procedure Act ("APA") in the following four ways: (1) the Policy constituted arbitrary and capricious agency action; (2) the Policy failed to comply with the law and agency rules; (3) the Policy failed to comply with notice and comment requirements; and (4) the Agency has unlawfully withheld and delayed action on plaintiffs' applications.[7] ECF No. 1 ¶¶ 78-99.

---

[5] Between August 1, 2021, and January 23, 2024, the Agency issued 1,010 notices of continued processing, of which approximately 726 beneficiaries "subsequently relocated to a location with consular services and received a conditional approval." U.S.C.I.S. 2503. In that same time period, the Agency issued 3,207 conditional approvals, including beneficiaries who relocated outside of Afghanistan after receiving notices of continued processing, and the Agency issued 13,706 denials. *Id*.

[6] For example, Mohammad Walid Azizi's application receipt date is located at MOHAMMAD WALID AZIZI 1.

[7] Plaintiffs also maintain that they are entitled to declaratory judgment and relief under the Mandamus Act. ECF No. 1 ¶¶ 100-105. However, plaintiffs are entitled to such relief only if they succeed on an APA claim. *See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform *a duty owed to the plaintiff*.") (emphasis added);

In January 2025, defendants moved to dismiss all claims, arguing, in part, that the court did not have jurisdiction to review plaintiffs' claims. ECF No. 15. The court rejected that argument, holding that plaintiffs' claims are reviewable. ECF No. 19 at 5-6. Aside from dismissing plaintiffs' claim pursuant to the Freedom of Information Act, the court denied defendants' motion to dismiss. *Id*. at 12. The parties now bring cross motions for summary judgment as to all claims. ECF Nos. 29 & 30. The motions are fully briefed. *See* ECF Nos. 33 & 34.

Defendants also have filed an unopposed request to seal "the entirety of the administrative record produced in this litigation." ECF No. 27 at 2. Courts have recognized "a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). "Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). A party seeking to file a document under seal "bears the burden of overcoming this strong presumption by" articulating "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure . . . ." *Id*. at 1178-79 (cleaned up).

Under the court's local rules, "[d]ocuments may be sealed only by written order of the Court, upon the showing required by applicable law." E.D. Cal. L.R. 141(a). A party seeking to file documents under seal must submit a Request to Seal Documents, which "shall set forth the statutory or other authority for sealing, the requested duration, the identity, by name or category, of persons to be permitted access to the documents, and all other relevant information." E.D. Cal. L.R. 141(b).

---

28 U.S.C. § 2201(a) "[A]ny court of the United States, upon the filing of an appropriate pleading, may *declare the rights and other legal relations of any interested party* seeking such declaration. . . .") (emphasis added). Further, while plaintiffs initially brought a claim pursuant to the Freedom of Information Act, that claim has been dismissed. *See* ECF No. 19 at 12.

Here, defendants argue that "the records are over 2,000 pages and contain pervasive references to personal contact information, immigration filings, sensitive information of non-parties, and other confidential information." ECF No. 27 at 2. They also assert that "[r]edacting a production of this magnitude would be impractical, inefficient, and could result in imperfect redaction to the detriment of the Parties' interests." *Id.*

These reasons are compelling. The individual records of plaintiffs' applications contain confidential information such as bank statements, personally identifiable information, and copies of government-issued identification. Courts have found that a party's privacy interests in sensitive information outweighs the public's interest in access. *See Bruce v. Azar*, 389 F. Supp. 3d 716, 727 (N.D. Cal. 2019), *aff'd*, 826 F. App'x 643 (9th Cir. 2020) (collecting cases); *Tocara Invs. v. Johhson*, No. 15-cv-0787-JAD-PAL, 2016 WL 11796094, at *1 (D. Nev. Oct. 19, 2016) (granting request to seal where the administrative record contained "sensitive financial and personal information"). Records of the Agency's inner-workings also contain sensitive, confidential information, particularly as it relates to the evacuation from Afghanistan. Courts have found that the government's national security interests outweigh the public's interest in access. *See MD Helicopters Inc. v. United States*, No. 19-cv-2236-PHX-JAT, 2019 WL 2415285, at *3 (D. Ariz. June 7, 2019) (collecting cases). Moreover, as defendants observe, the record is voluminous such that redacting this information would be extremely difficult, if not impossible. Accordingly, the court will grant defendants' request to seal, ECF No. 27.

## Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

Each party's position must be supported by: (1) citations to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) argument showing that the materials cited do not establish the presence or absence of a genuine factual dispute or that the opposing party cannot produce admissible evidence to support its position. *See* Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The court may consider other materials in the record not cited by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323). "[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact,' and may 'rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'" *Simmons*, 609 F.3d at 1017 (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)). Moreover, the non-moving party must "show more than the mere existence of a scintilla of evidence." *In re Oracle*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252). However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

The court must apply standards consistent with Rule 56 to determine whether the moving party has demonstrated there to be no genuine issue of material fact and that judgment is appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted). The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**Analysis**

The court addresses its jurisdiction before analyzing plaintiffs' APA claims.

## I. Jurisdiction

Defendants argue that the court does not have jurisdiction. ECF No. 30-1 at 25-36. Plaintiffs disagree. ECF No. 33 at 11-17. As noted, defendants argued in their motion to dismiss that the court lacked jurisdiction over plaintiffs' claims, and the court held to the contrary. *See* ECF No. 15-1 at 19-22; ECF No. 19 at 6.

The APA applies to agency actions "except to the extent that statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The INA provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B).

Defendants argue that the court "should revisit whether jurisdictional and justiciability bars foreclose review of Plaintiffs' claims." ECF No. 30-1 at 25. Principally, defendants assert that section 1252(a)(2)(B)(ii) bars judicial review. *Id*. However, as the court recognized in previously dismissing this argument, courts have distinguished between judicial review of an individual parole decision and collateral challenges to agency policies. "While § 1252(a)(2)(B)(ii) undoubtedly bars judicial review of individual parole decisions, courts have declined to apply it to claims challenging the legality of policies and processes governing discretionary decisions under the INA." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018). Other courts in this circuit have come to the same conclusion. *See Komma v. Edlow*, No. 2:25-cv-3702-DJC-AC, 2026 WL 1113887, at *3 (E.D. Cal. Apr. 24, 2026) (holding that section 1252(a)(2)(B)(ii) does not strip the court of jurisdiction over challenges to the government's duty to process visa applications); *Behdin v. Edlow*, No. 26-cv-0566-SVK, 2026 WL 1031079, at *6-11 (N.D. Cal. Apr. 16, 2026) (concluding that the court has jurisdiction over the plaintiffs' claims challenging USCIS policies); *Doe v. Mayorkas*, 530 F. Supp. 3d 893, 909 (N.D. Cal. 2021) ("[W]hile it is true that there is no judicial review for individual visa or refugee applications, this denial of judicial review 'does not apply to challenges to immigration policies.'").

Here, plaintiffs challenge immigration policies, not an individual parole decision. *See* ECF No. 1 ¶¶ 78-99. Consequently, defendants' citations to binding precedent are inapposite; the cases cited analyze a court's jurisdiction to review an individual decision.[8] *See* ECF No. 30-1 at 26-27 (citing *Romero v. Garland*, 999 F.3d 656 (9th Cir. 2021), *Hassan v. Chertoff*, 593 F.3d 785 (9th Cir. 2010), *Padilla v. ICE*, 953 F.3d 1134 (9th Cir. 2020), and *Chairez v. Mayorkas*, 168 F.4th 1227 (9th Cir. 2026)). In line with the other courts to have addressed this issue, this court

[8] The out-of-circuit authority cited by defendants is also unpersuasive. *See* ECF No. 30-1 at 29. As plaintiffs point out, the "out-of-circuit cases concern a different kind of hold policy: visa-retrogression holds in the adjustment-of-status context, which operate within a visa-number system established by Congress." *See* ECF No. 33 at 15. As one court explained, "[v]isa retrogression stands on a different factual and legal footing" than other immigration applications because "[u]nder the retrogression hold policies, USCIS placed adjustment applications on hold until a condition precedent was satisfied—availability of a visa number—and in some cases those holds lasted for years." *Behdin*, 2026 WL 1031079, at *9.

holds that section 1252(a)(2)(B)(ii) does not bar review of plaintiffs' claims because they are collateral challenges to immigration policies that do not seek judicial review of an individual parole decision.

Defendants also argue that there is "no meaningful standard to judge the agency's exercise of discretion in the parole context." ECF No. 30-1 at 31. However, as the court observed in previously dismissing this argument that was presented in defendants' motion to dismiss, the Supreme Court has held that "DHS may exercise its discretion to parole applicants only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *See Biden v. Texas*, 597 U.S. 785, 806-07 (2022) (internal quotation marks and citations omitted); ECF No. 19 at 6. Defendants identify no intervening case law that disturbs this binding precedent, which provides the standard for reviewing the agency's exercise of discretion.

Lastly, defendants assert that the doctrine of consular non-reviewability forbids the court from considering plaintiffs' claims. ECF No. 30-1 at 33. However, as the Supreme Court held, this doctrine prohibits federal courts from reviewing "a consular officer's denial of a visa." *See Dep't of State v. Munoz*, 602 U.S. 899, 908 (2024). But plaintiffs do not challenge the denial of an individual immigration application; they challenge immigration policies. As such, the doctrine of consular non-reviewability is inapplicable.

Accordingly, the court holds that it has jurisdiction to review plaintiffs' claims. This holding accords with the strong presumption favoring judicial review of administrative action, *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020), which the Supreme Court has "consistently applied" to immigration laws, *Kucana v. Holder*, 558 U.S. 233, 251 (2010).

## II. APA

### A. Failure to Comply with Notice and Comment Requirements

Plaintiffs claim that the Policy failed to comply with the APA's notice and comment requirements. ECF No. 1 ¶¶ 91-95. An agency must ordinarily provide notice of a proposed legislative rule that includes "a statement of the time, place, and nature of public rule making

proceedings." 5 U.S.C. § 553(b)(1). This requirement, however, does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(B); *see also Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003).

The Court of Appeals has borrowed the D.C. Circuit's three-part test for determining whether a rule is legislative. *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (citing *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993)). Under that test, a rule is legislative if: "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule." *Id.*

Plaintiffs present three arguments. First, they assert that the Policy introduced "a categorical presumption of denial" and no longer facilitated "case-by-case adjudication." ECF No. 29-1 at 19. That interpretation is unfounded. As noted, the Policy stated that "each application must be evaluated on its own merits taking into account all the factors unique to the specific parole request and considering the totality of the circumstances." U.S.C.I.S. 1094. Moreover, while the Policy provided that applications would "generally" be denied for beneficiaries who remained in Afghanistan and did not demonstrate a heightened need for protection, it did not categorically deny such applications, instead entrusting adjudicators to exercise discretion. U.S.C.I.S. 1096. To be sure, plaintiffs do not argue that the Agency lacked statutory authority to issue the Policy. Moreover, the Policy did not create new standards for adjudicating protection-based parole applications; indeed, prior to 2021, the Agency's policies stated that "[g]enerally, parole is not authorized for protection reasons" and "[s]hould not be used to bypass refugee processing." *See* U.S.C.I.S. 324; *see also* U.S.C.I.S. 31 ("Parole is only rarely granted [for protection reasons], even if urgent humanitarian reasons have been established.") (emphasis omitted).

Second, plaintiffs argue that the Policy dictated that parole processing be suspended in favor of visa processing. ECF No. 29-1 at 19. Plaintiffs point to the Policy's statement that, for a beneficiary who is approved, "the processing of the parole request should be suspended (marked

closed in the case management system) and the beneficiary referred to immigrant visa processing . . . ." *See* U.S.C.I.S. 1097. This statement does not support plaintiffs' assertion that the Policy dictated that parole processing be suspended at large. Rather, this language concerns applications that are approved.

Lastly, plaintiff asserts that the Policy created a new "bureaucratic status" of continued parole processing. ECF No. 29-1 at 20. Plaintiffs refer to the Policy's provision that, if a beneficiary in Afghanistan is eligible for parole, "the adjudicator may issue a Parole Notice (Suspension of Processing) stating that the Agency cannot complete processing of the parole request unless and until the beneficiary informs the Agency that they are able to report to a U.S. embassy or consulate." *See* U.S.C.I.S. 1096. Plaintiffs do not explain why the creation of this status means the Policy was legislative. Indeed, the guidance states that the status was to be lifted once the beneficiary indicated an ability to report to a U.S. embassy or consulate. *See id*.

Plaintiffs fail to identify any evidence showing that the Policy lacked "an adequate legislative basis[,]" "explicitly invoked [the Agency's] general legislative authority[,]" or "effectively amend[ed] a prior legislative rule." *See Erringer*, 371 F.3d at 630. The court finds that the Policy falls under the exception to the notice and comment requirements for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."[9] *See* 5 U.S.C. § 553(b)(B). Accordingly, defendants are entitled to judgment as to this claim.

**B. Arbitrary, Capricious, or Unlawful**

Plaintiffs claim that the Agency's actions, particularly the Policy, were (1) arbitrary and capricious, and (2) unlawful. ECF No. 1 ¶¶ 78-90. Under the APA, a decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under this standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

---

[9] Consequently, the court does not address the parties' arguments as to whether the Policy fell under the foreign affairs exception to the notice and comment requirements. *See* ECF No. 29-1 at 20; ECF No. 30-1 at 54-59.

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, a court may set aside a decision only if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

"The agency must articulate a rational connection between the facts found and the choice made" and courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Moreover, "'[a]gency action is 'not in accordance with the law' when it is in conflict with the language of the statute' relied upon by the agency." *California v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 718 F. Supp. 3d 1060, 1078 (N.D. Cal. 2024) (quoting *Nw. Env't Advocs. v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

Plaintiffs present five arguments. First, they rehash their arguments addressed above, asserting that the Policy violated the INA's mandate to adjudicate applications on a case-by-case basis because it stated that certain protection-based applications would be "generally" denied, and that approved beneficiaries were referred to immigration processing for a visa. ECF No. 29-1 at 21-22. As held above, the Policy did not conflict with the INA; on the contrary, it emphasized that "each application must be evaluated on its own merits taking into account all the factors unique to the specific parole request and considering the totality of the circumstances." *See* U.S.C.I.S. 1094. As such, plaintiffs fail to establish that the Policy violated the INA.[10]

Moreover, plaintiffs' characterization of the Policy as promoting a categorical denial is belied by the record. "In fiscal year 2023, the approval rate for initial Form I-131 filings on behalf of Afghan national beneficiaries was approximately 43%." U.S.C.I.S. 2498; *see also* U.S.C.I.S. 2127 (noting a 61% approval rate between January 2024 and May 2024, "largely due"

[10] Defendants argue that, under the INA, "[t]here is no requirement to deny parole on a case-by-case basis." ECF No. 30-1 at 37-38. For purposes of this order, the court has assumed *arguendo* that the INA requires the Agency to review parole applications on a case-by-case basis. Although the court is skeptical of defendants' argument to the contrary, it chooses for purposes of judicial economy not to address it, since the court finds that even if the INA imposed such a requirement, there is no evidence that the Agency has failed to adhere to it.

to the focus on Afghans living in Pakistan).[11]

Second, plaintiffs assert that the Agency abandoned the practice of conditional approvals "not because it was impossible, but because it chose to." ECF No. 29-1 at 22. However, plaintiffs seemingly ignore that the Agency decided to no longer grant conditional approvals because, as of September 1, 2021, evacuation flights had ended. *See* U.S.C.I.S. 590. Indeed, the Agency recognized that the primary motivation behind conditional approval in the first place was to facilitate getting beneficiaries on evacuation flights. U.S.C.I.S. 596. Even if plaintiffs identify alternative policies that the Agency could have implemented at that time, it is not the court's task to determine what would have made better policy. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). Rather, the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *See Bowman Transp., Inc.*, 419 U.S. at 286.

The court finds that the Agency acted reasonably when it chose to no longer expedite Afghan parole applications because the evacuation had ended. While the Agency issued conditional approvals, the record reveals that this practice lasted for fewer than three weeks and was done in an emergency context. Moreover, the record shows that the Agency considered alternatives but ultimately settled on prioritizing applications for those outside of Afghanistan. *See* U.S.C.I.S. 693, 698, 863, 876, 954. Plaintiffs fail to identify any evidence showing that the Agency's decision to end conditional approval was arbitrary, capricious, or unlawful.[12]

---

[11] Plaintiffs take issue with these numbers and instead present their own calculations based on statistics provided in the record. *See* ECF No. 33 at 22-24. The statistics are as follows: between August 1, 2021, and January 23, 2024, the Agency received 53,278 applications and adjudicated 17,923 applications, which included 1,010 notices of continued processing, 3,207 conditional approvals, and 13,706 denials. *See* U.S.C.I.S. 2502-03. Despite plaintiffs' calculations, the statistics do not support their argument that the Agency instituted a policy of categorically denying applications for Afghans in Afghanistan.

[12] Plaintiffs argue that the Agency should have undertaken efforts similar to those it undertook in November 2023. ECF No. 29-1 at 22. In response to Pakistan deporting thousands of Afghan refugees, the Agency chose to expedite the adjudication of "pending humanitarian parole applications submitted on behalf of Afghan nationals currently located in Pakistan." U.S.C.I.S. 1955. The context surrounding these applications is distinct from that of the applications from Afghans in Afghanistan. There were approximately 4,000 parole cases pending

Third, plaintiffs argue that the Agency "ignored profound reliance interests" in the form of Afghans awaiting review of their parole applications. ECF No. 29-1 at 23. As an initial matter, plaintiffs do not establish that there were protected reliance interests based on the Agency's use of conditional approval over the span of fewer than three weeks in August 2021. The Court of Appeals has held that "a government body's past practice of granting a government benefit is insufficient to establish a legal entitlement to the benefit." *Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1021 (9th Cir. 2011). Moreover, even if plaintiffs established such interests, they do not identify any evidence showing that the Agency chose to ignore those interests. Indeed, the record reveals that the Agency has focused efforts on reducing the backlog of Afghan parole requests. *See* U.S.C.I.S. 2059, 1724, 2007. Such efforts are inconsistent with a finding that the Agency ignored the interests of applicants.

Fourth, plaintiffs assert that the Policy was inconsistent with the Agency's past practice regarding the issuance of requests for evidence ("RFEs"). ECF No. 29-1 at 23-24. However, plaintiffs fail to identify any portion of the Policy that conflicts with the Agency's past practice. A 2017 Agency manual instructed adjudicators to deny an application without first issuing an RFE where "[t]he officer does not believe there is a reasonable possibility that the petitioner can provide the additional evidence needed to adjudicate the parole request." U.S.C.I.S. 73. Notably, this manual provided the following example of when it was appropriate to deny an application without first issuing an RFE: "the petitioner asserts that she is at risk of harm due to civil conflict in her home country and submits general media articles on the fighting and numerous casualties the fighting has caused." *Id.*

This manual is consistent with the Policy's provision that "USCIS generally approves requests based on protection needs only if there is credible, third-party evidence naming the beneficiary that shows the beneficiary is targeted and at imminent risk of severe harm." *See* U.S.C.I.S. 1076. Plaintiffs fail to identify any examples of the Agency failing to comply with its

---

for Afghans living in Pakistan. U.S.C.I.S. 1947. What is more, as defendants observe, "[t]he United States has a consular presence in Pakistan." ECF No. 30-1 at 50. Consequently, plaintiffs' argument is unpersuasive.

RFE policy.[13] Moreover, plaintiffs' argument is belied by the record, which shows that, as of January 12, 2023, the Agency had 1,741 RFEs pending for Afghan parole applicants. U.S.C.I.S. 1724.

Plaintiffs' final argument is that the Agency's actions in September and October 2021 were arbitrary and capricious because they were concealed from Congress. ECF No. 29-1 at 24-25. Plaintiffs rely solely on one email from September 14, 2021, in which the Agency indicated that it had received Congressional inquiries as to the status of Afghan parole applications, and it acknowledged that staffers had internally drafted a "general response" to avoid "sharing that all Afghan [humanitarian parole] requests [were] currently on hold." *See* U.S.C.I.S. 665. As noted, by November 5, 2021, the Agency implemented the Policy and resumed reviewing applications. *See* U.S.C.I.S. 1075.

Plaintiffs neither identify legal authority nor adequately explain why this email supports a finding that the Agency's actions in September and October 2021 were arbitrary and capricious. Indeed, beginning in September 2021, the Agency faced the daunting task of determining how to process parole applications when evacuation flights had stopped, consular services were unavailable, most requests were protection-based, and many applicants could not satisfy medical requirements. *See* U.S.C.I.S. 590, 640, 2233. That the Agency took two months to craft the Policy is neither arbitrary nor capricious, and the court is not persuaded to find otherwise based on only the cited email.

Lastly, it bears mention that the court's holdings here are consistent with those by the *Roe* court, which appears to be the only other court to have addressed these issues.[14] *See Roe v.*

---

[13] Similarly, the Policy is consistent with prior Agency practice as to the requirement that beneficiaries travel to a location with consular services. An Agency training from prior to August 2021 noted that protection-based parole applications would only be granted where the beneficiary can "get to another location for processing if [there is] no U.S. Embassy presence in the country." *See* U.S.C.I.S. 326.

[14] Plaintiffs attempt to distinguish *Roe* based on the same arguments rejected above, such as "the existence of a concealed hold" and a "categorical abandonment" of RFEs. *See* ECF No. 33 at 17-18. While the plaintiffs in *Roe* were no longer awaiting adjudication of their applications, this distinction seemingly did not factor into the court's analysis of whether the Agency's actions were arbitrary, capricious, or unlawful. Moreover, as defendants point out, the complaint here and the complaint in *Roe* have identical language in the APA claims alleging that

*Noem*, 800 F. Supp. 3d 146, 170 (D. Mass. 2025). In *Roe*, the court held that the Policy was not arbitrary, capricious, or unlawful. *Roe*, 800 F. Supp. 3d at 171-79. Specifically, the court found that the Policy's language that certain parole application would be "generally" denied was consistent with prior Agency practice. *Id*. at 172. The court also held that the notice of continued processing did not constitute "an outright refusal" but rather "required the re-evaluation of a beneficiary's parole eligibility upon arrival in a third country." *Id*. at 173. Moreover, the court found that the limited time period of conditional parole in August 2021 "did not generate a serious reliance interest" on the part of Afghan applicants. *Id*. at 178. The court also held that the Agency considered alternatives, the Policy mirrored the Agency's past practice of requiring a beneficiary to travel to a location with consular services, and the record showed that historically the Agency "rarely granted parole requests based only on protection grounds." *See id*. at 176-78.

Further, the *Roe* court held that:

> The fact that USCIS seemingly adapted the adjudication of Afghan parole requests to reflect the extraordinary and unprecedent crisis unfolding in August, [citation], was laudable. It cannot be that emergency measures undertaken in a time of crisis forever obligate the agency to keep those same measures in place as the circumstances change and evolve. Determining otherwise would discourage an agency from responding flexibly and compassionately to a humanitarian emergency. Re-evaluating and re-prioritizing how to expend its efforts, as [the defendants] have done here, is squarely within the agency's prerogative.

*Id*. at 177.

This court is persuaded by the *Roe* court's reasoning and adopts it in full. Plaintiffs have failed to identify any evidence showing that the Agency's actions were arbitrary, capricious, or unlawful, and substantially similar arguments based on nearly identical claims have also been rejected by the *Roe* court. Accordingly, defendants are entitled to judgment as to plaintiffs' claims of (1) arbitrary and capricious action and (2) unlawful action.

---

the Agency's actions were arbitrary, capricious, and unlawful. *Compare* ECF No. 1 ¶¶ 83-86, 89-90 *with Roe v. Noem*, No. 1:22-cv-10808-ADB (D. Mass), ECF No. 1 ¶¶ 179-81, 184, 187-88.

**C. Unreasonable Delay**

Finally, plaintiffs claim that the Agency has unreasonably delayed adjudication of their parole applications. ECF No. 1 ¶¶ 96-99. In determining whether an agency action has been unreasonably delayed, courts consider the six "TRAC" factors:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1138-39 (9th Cir. 2020) (quoting *Telecomms. Research and Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984)).

Although not determinative, the first factor, "rule of reason," is the most important. *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017). Courts consider the length of the delay and the cause of the delay in assessing "whether there is any rhyme or reason for the Government's delay—in other words, whether the agency's response time . . . is governed by an identifiable rationale." *Poursohi v. Blinken*, No. 21-cv-1960, 2021 WL 5331446, at *4 (N.D. Cal. Nov. 16, 2021) (cleaned up). Where Congress has not supplied a period for agency action, courts look to case law in assessing whether the agency's action is unreasonably delayed. *See Sarlak v. Pompeo*, No. 20-cv-0035-BAH, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020) ("Absent a congressionally supplied yardstick, courts typically turn to case law as a guide.").

Plaintiffs Mohammad Walid Azizi, Nargis Ghafoori, Azizalrahman Rahmani, Beheshta Rahmani, Husna Rahmani, and Shadab Shahab submitted their parole applications in October 2021, while plaintiffs Shahram Mohammad Azizi and Asayesh Azizi submitted their applications in December 2023. *See* Each Individual Record at 1. Accordingly, nearly 59 months have elapsed since the earliest of plaintiffs' applications was received. Generally, courts have found 'immigration delays in excess of five, six, [and] seven years are unreasonable, while those

between three to five years are often not unreasonable.'" *Ortiz v. U.S. Dep't of State*, Case No. 22-cv-0508-AKB, 2023 WL 4407569 *8 (D. Idaho July 7, 2023).

Existing case law supports the view that, however burdensome a delay of 59 months in this context may be, such a delay does not violate the APA. *See Skalka v. Kelly*, 246 F. Supp. 3d 147, 154 (D.D.C. 2017) (citing case law suggesting that even a five- to ten-year delay in the immigration context may be reasonable); *Beyene v. Napolitano*, No. 12-cv-1149-WHA, 2012 WL 2911838, at *9 (N.D. Cal. July 13, 2012) (holding that while the "case presents a close call," a delay of nearly five years in adjudicating the plaintiff's application for adjustment of immigration status was not unreasonable); *Jamal v. Johnson*, No 2:15-cv-8088-ODW, 2016 WL 4374773, at *6 (C.D. Cal. Aug. 15, 2016) (noting that delays of four years not unreasonable, but holding that delay of over seven years to adjudicate the plaintiff's application for adjustment of status, combined with the defendants' unwillingness to indicate if or when the plaintiff's petition will be adjudicated, was unreasonable); *Ou v. Johnson*, No. 15-cv-03936-BLF, 2016 WL 7238850, at *3 (N.D. Cal. Feb. 16, 2016) (noting that "courts in this district have generally found delays of four years or less not to be unreasonable under the APA"); *Zhang v. Cissna*, No. 18-cv-09696-MWF, 2019 WL 3241187, at *5 (C.D. Cal. Apr. 25, 2019) ("[T]he Court cannot conclude, as a matter of law, that [a four-year] delay in processing [the plaintiff's] application was unreasonable.").

Moreover, courts have held that "[w]hat constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case." *Gelfer v. Chertoff*, No. 06-cv-6724-WHA, 2007 WL 902382, at *2 (N.D. Cal. Mar. 22, 2007). Such consideration depends, in part, "upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). Here, the reason for the delay is "governed by an identifiable rationale" in that the Agency has received an unusually high number of Afghan humanitarian parole applications. *See Poursohi*, 2021 WL 5331446, at *4. As noted, between August 1, 2021 and January 23, 2024, the Agency received 53,278 such applications. U.S.C.I.S. 2502. When applications began pouring in, the Agency "only had three permanent adjudication officers on board to process humanitarian parole cases, as the office

received fewer than 2,000 such requests per fiscal year, on average." U.S.C.I.S. 2576. The Agency has made strides in adjudicating these applications, but it understandably has taken years to work through its backlog.[15] Under these circumstances, a delay of nearly 59 months is reasonable. The first factor thus weighs in defendants' favor.

For the second TRAC factor, the court considers whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute." *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1138. Congress has not provided a timetable for processing parole applications. *See* 8 U.S.C. § 1182(d)(5)(A). Rather, "Congress has given the State Department and other agencies wide discretion in the area of immigration processing." *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 318 (D.D.C. 2020) (cleaned up). Because there is no statutorily mandated timeline for the Agency to process plaintiffs' applications, this factor is neutral. *See Poursohi*, 2021 WL 5331446, at *9 ("[T]he absence of a mandatory timetable for adjudication of [the plaintiffs'] Application combined with the fact that the delay comports with the rule of reason, the second TRAC factor also weighs in [the defendant's] favor or is at least neutral.").

"The third and fifth factors overlap, requiring the court to consider whether human health and welfare are at stake, and the nature and extent of the interests prejudiced by the delay." *Poursohi*, 2021 WL 5331446, at *9. Plaintiffs assert that they "remain in Taliban-controlled Afghanistan" navigating "life and death" situations. ECF No. 29-1 at 27. Considering these allegations, in addition to the instability of Afghanistan, the court finds that this factor cuts in favor of plaintiffs. *See Afghan & Iraqi Allies v. Blinken*, 643 F. Supp. 3d 148, 156 (D.D.C. 2022),

[15] It bears mention that a presidential proclamation from December 2025 has restricted the entry of Afghans into the United States. *See* Presidential Proclamation 10998, 90 Fed. Reg. 59717 (Dec. 19, 2025). Relatedly, in that same month, the Agency issued a hold on all pending applications from Afghans. *See* Policy Memorandum 602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*, December 2, 2025. Defendants represent that plaintiffs' applications are subject to this hold. *See* ECF No. 30-1 at 67; *see also* Each Individual Record at 1 (showing "Case State" as "Hold"). Plaintiffs do not challenge the December 2025 policies; instead, their complaint centers on the Policy and other agency actions leading up to October 2024. *See generally* ECF No. 1. Plaintiffs acknowledge that the December 2025 policies are not at issue. *See* ECF No. 33 at 31.

*aff'd sub nom*., *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807 (D.C. Cir. 2024) (finding that the third and fifth factors weigh in favor of the plaintiffs where they await adjudication of their visa applications in Afghanistan with "increasingly desperate and dangerous" conditions).

Under the fourth TRAC factor, the court considers the effect of expediting the adjudication of the beneficiary's application on other agency action of higher or competing priority. *Kapoor v. Blinken*, No. 21-cv-1961-BLF, 2022 WL 181217, at *8 (N.D. Cal. Jan. 20, 2022). This factor favors defendants; plaintiffs are not alone in their circumstances, and ordering defendants to prioritize plaintiffs' applications only further delays the resolution of other applications.[16] *See Ali*, 2024 WL 2274912, at *6, *Throw v. Mayorkas*, No. 3:22-CV-05699-DGE, 2023 WL 2787222, at *5 (W.D. Wash. Apr. 5, 2023) (noting many families face delays and ordering the State Department to schedule the beneficiary plaintiff's interview would not ameliorate the situation); *Jain v. Renaud*, No. 21-CV-03115-VKD, 2021 WL 2458356, at *6 (N.D. Cal. June 16, 2021) ("Most courts have found that the fourth TRAC factor weighs heavily in the agency's favor when a judicial order putting plaintiffs at the head of the line would simply move all others back one space and produce no net gain.").

Under the sixth TRAC factor, where a plaintiff has not made cognizable allegations of impropriety, "courts in the Ninth Circuit have found this factor to either weigh in the government's favor or to be neutral." *Poursohi*, 2021 WL 5331446, at *11. Plaintiffs assert that the record establishes the Agency's "deliberate concealment" of a delay, relying on the aforementioned email from September 2021 in which the Agency indicated that it did not want to reveal to Congress that it had temporarily paused adjudicating Afghan parole applications. *See* ECF No. 29-1 at 29 (citing U.S.C.I.S. 665). Plaintiffs also assert that "[t]he delay here is not merely a function of volume. It is a direct consequence of the unlawful policies detailed above." *Id*. Because these arguments have been considered and rejected, the court finds that plaintiffs cannot establish impropriety on the part of defendants. Indeed, plaintiffs identify no evidence

[16] Plaintiffs argue that this factor weighs in their favor because, in Pakistan, the Agency was able to adjudicate thousands of cases. ECF No. 33 at 30-31. This argument ignores that ordering defendants to prioritize plaintiffs' applications would delay the resolution of other applications.

that is particular to their applications but instead generally rely on the arguments addressed above. Accordingly, this factor is neutral.

After considering the TRAC factors, the court finds that plaintiffs' unreasonable delay claim must fail. Even assuming that the allegations of the complaint are sufficient to satisfy factors three and five, the alleged delay cannot as a matter of law be considered unreasonable. Accordingly, defendants are entitled to judgment as to this claim.[17]

Accordingly, it is hereby ORDERED that:

1. The Clerk of Court shall substitute Markwayne Mullin and Joseph Edlow as defendants. Kristi Noem and Jennifer Higgins shall be terminated as parties to this action.

2. Defendants' request to seal, ECF No. 27, is GRANTED.

3. Plaintiffs' motion for summary judgment, ECF No. 29, is DENIED.

4. Defendants' motion for summary judgment, ECF NO. 30, is GRANTED.

5. The Clerk of Court is ordered to enter judgment accordingly and close this case.

IT IS SO ORDERED.

Dated: August 31, 2026

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

---

[17] Because the court holds that defendants are entitled to judgment as to all of plaintiffs' APA claims, the court does not reach the parties' remaining arguments regarding declaratory judgment, a mandamus, and other relief. *See* ECF No. 29-1 at 29-30; ECF No. 30-1 at 68-70; ECF No. 33 at 32-34; ECF No. 34 at 33-34.